In the Matter of the VALUATION PROCEEDINGS UNDER SECTIONS 303(c) AND 306 OF The REGIONAL RAIL REORGANIZATION ACT OF 1973.

Misc. No. 76–1.

Special Court,
Regional Rail Reorganization Act.

Oct. 12, 1977.

On Motions for Reconsideration
Nov. 18, 1977.

Edwin M. Zimmerman, William D. Iverson, Stuart C. Stock, Washington, D. C. (Charles E. Buffon, Paul R. Duke, David B. Isbell, Harris Weinstein, Eugene D. Gulland, John D. Taurman, William P. Skinner, Wynne M. Teel, Theodore Voorhees, Jr., and Covington & Burling, Washington, D. C., John B. Rossi, Jr., Philadelphia, Pa., of counsel), for Penn Central Trustees and Certain Affiliated Transferors.

Louis A. Craco, New York City (Walter H. Brown, Jr., Thomas L. Bryan, Michael B. Targoff, Rebecca T. Halbrook, Richard L. Posen, and Willkie, Farr & Gallagher, New York City, Frederic L. Ballard, Sr., and Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., of counsel), for intervening Penn Central Lienholders.

George J. Wade, New York City (Robert H. MacKinnon, Thomas M. Geisler, Jr., Gary G. Lyons, and Shearman & Sterling, New York City, of counsel), for intervenor Citibank, N.A., as Agent for the Committee of Secured Bank Creditors in the Penn Central Transportation Company Reorganization Proceedings.

David Berger, Philadelphia, Pa. (Daniel M. Berger, David Berger, P.A., Philadelphia, Pa., of counsel), for intervenor Penn Central Company.

Joseph Auerbach, Boston, Mass. (Morris Raker, Thomas R. Wardell, Harvey E.

998

Bines, Thomas D. Halket, and Sullivan & Worcester, Boston, Mass., James Wm. Moore, New Haven, Conn., Thomas W. Armstrong, Washington, D. C., of counsel), for Trustee of The New York, New Haven and Hartford Railroad Co.

Harry G. Silleck, Jr., New York City (John L. Altieri, Jr., and Mudge, Rose, Guthrie & Alexander, New York City, of counsel), for Trustees of Erie Lackawanna Railway Company and Certain Affiliated Non-Bankrupts.

Howard H. Lewis, Philadelphia, Pa. (James A. Sox, and Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa.; Lockwood W. Fogg, Jr., Plymouth Meeting, Pa., of counsel), for Trustees of the Reading Company and for Its Wholly-Owned Subsidiaries.

Stanley Weiss, Newark, N. J. (M. Elaine Jacoby, Dean R. May, and Carpenter, Bennett & Morrissey, Newark, N. J., of counsel), for Trustee of the Central Railroad Co. of New Jersey.

David C. Toomey, Philadelphia, Pa. (Jared I. Roberts, Richard M. Abrams, and Duane, Morris & Heckscher, Philadelphia, Pa., of counsel), for Trustee of the Lehigh Valley Railroad Co.

Timothy V. Smith, New York City, for Trustee of The Lehigh and Hudson River Railway Co.

Charles I. Thompson, Jr., Philadelphia, Pa., for The North Pennsylvania Railroad Company, the Delaware and Bound Brook Railroad Company, the Philadelphia, Germantown and Norristown Railroad Co. and Plymouth Railroad Co.

Alan C. Kauffman, Philadelphia, Pa. (Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., of counsel), for the Peoria and Eastern Railway Co.

Robert W. Ginnane, Washington, D. C. (George F. Galland, and Galland, Kharasch, Calkins & Brown, John M. Gibbons, and Stroock, Stroock, & Lavan, Washington, D. C., of counsel), for Norwich & Worcester Railroad Co.

Frank B. McShane, New York City (Walsh & Frisch, New York City, of counsel), for Mahoning Coal Railroad Co.

Edmund J. Kenney, Chicago, Ill. (James E. Hussey, Winston & Strawn, Chicago, Ill., of counsel), for Trustee of the Chicago River and Indiana Railroad Co.

Michael E. Patterson, New York City (Steven R. Gross, and Debevoise, Plimpton, Lyons & Gates, New York City, Edward I. Dobin, and Curtin & Heefner, Morrisville, Pa., of counsel), for Trustees for Pennsylvania Tunnel and Terminal Railroad Co., and Trustee for the New York Connecting Railroad Co.

Joseph S. Radom, and Thomas B. Radom, Detroit, Mich., for Trustee of the Ann Arbor Railroad Co.

Leon Leighton, New York City, for Minority Stockholders of Mahoning Coal Co., amici curiae.

Perrin C. Hamilton, Philadelphia, Pa., for the East Pennsylvania Railroad Co.

Earl J. Krock, Cleveland, Ohio, for Kalamazoo, Allegan & Grand Rapids Railroad Co.

Herbert G. Schick, and Hepburn, Ross, Willcox & Putnam, Philadelphia, Pa., Jerome K. Walsh, and Walsh & Frisch, New York City, for Secondary Debtors of The Penn Central Transportation Co.

Joseph J. Connolly, and Goodman & Ewing, Philadelphia, Pa., for Little Miami Railroad Co. and Fort Wayne & Jackson Railroad Co. and Secondary Debtors of the Penn Central Transportation Co.

Lloyd N. Cutler, William T. Lake, William R. Perlik, Louis R. Cohen, Kevin P. Charles, Robert H. Kapp, David R. Johnson, Washington, D. C. (Stephen F. Black, John F. Cooney, Jay P. Urwitz, Wilmer, Cutler & Pickering, Howard R. Moskof, Peter F. Rousselot, Joe Chartoff, Eric A. Von Salzen, George W. Mayo, Jr., Hogan & Hartson, Cary W. Dickieson, Stephen C. Rogers, G. Joseph King, Francis P. Dicello, Peter J. Carre, and Jordon Jay Hillman, Sp. Counsel, U. S. Railway Association, Washington, D. C., of counsel), for United States Railway Association.

Barbara Allen Babcock, Asst. Atty. Gen., Rex E. Lee, Asst. Atty. Gen., Paul M. Tschirhart, John H. Broadley, U. S. Dept. of Justice, Washington, D. C., Linda Heller Kamm, Gen. Counsel, Donald T. Bliss, Deputy Gen. Counsel, Alexander P. Humphrey, Justine Fischer, Phillip J. Ward, U. S. Dept. of Transportation, Washington, D. C., for United States of America.

John G. Harkins, Jr., Philadelphia, Pa. (Richard M. Rindler, Pepper Hamilton & Scheetz, Ronald M. Dietrich, John F. DePodesta, Philadelphia, Pa., of counsel), for Consolidated Rail Corp.

Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.

FRIENDLY, Presiding Judge:

## I. Introduction

In this opinion we continue the discussion of the nature of the Rail Act in Part III of our opinion of October 18, 1976, 425 F.Supp. at 270–71, and shall consider the constitutionality of compensating the transferors in other than cash, an issue on which we requested briefing by our notice of April 14, 1977. We shall also deal with certain of the issues outlined in our Memorandum of June 16, 1976, 425 F.Supp. 266, 281–87, relating to the determination of net liquidation value (NLV) under § 306 of the Rail Act, of constitutional minimum value (CMV), and of value of other benefits (VOB). In accordance with our Memorandum of June 16, 1976, 425 F.Supp. at 289, opening briefs on the issues of NLV, CMV, and certain other matters were received on January 6, an answering brief of the Government parties on February 20, and reply briefs on March 18, 1977. By order of December 15, 1976, we set a schedule with respect to the VOB issue which required initial briefs to be exchanged on February 22, 1977 and further briefs on March 18, 1977. We heard oral argument on April 12 and 13, 1977. In the meanwhile, discovery has been continuing under the supervision of Judge Thomsen.

As indicated in the Memorandum of June 16, 1976, 425 F.Supp. at 277–78, the court believed that extensive briefing and argument of certain general questions at this time would permit us to announce our views with respect to a number of legal issues and enable us to establish procedures for the further conduct of the necessarily complex valuation proceedings required by the Rail Act, and thereby reduce the time and expense, huge under the best of circumstances, which will be required to conclude this case. We thought then, and we think now, that simply to appoint a number of special masters who would be set loose without any guidelines from us "would produce utter chaos," 425 F.Supp. at 277.[1] We remain convinced of the wisdom of proceeding in the manner outlined in our June 16, 1976 Memorandum, even though it now appears that decision on some issues that have been briefed would be premature. Even as to such issues the efforts of counsel will not have been wasted, since these questions, or most of them, will have to be decided at a later date.

## II. Reorganization v. Eminent Domain: The Propriety of Compensation Other than Cash

In our memorandum of June 16, 1976, we noted that "a question lurking in the case is whether the standard of valuation should be different if the Act be regarded as a reorganization statute, as an eminent domain statute or as both," 425 F.Supp. at 280 (footnote omitted), and requested that this issue be included in the first round of briefing. Responding to such briefing in our opinion of October 18, 1976, 425 F.Supp. at 270–71, we said that perhaps the question could be more accurately stated as being whether the Act involves a taking and, if so, whether the "constitutional minimum" required both by the terms of the Act and by the Fifth Amendment differs if the Act

---

1. We say this despite our recognition that any determinations made by us are subject to review by the Supreme Court. Section 303(d) of the Rail Act, as we read it, would permit the Court to review this opinion now, despite its interlocutory character, if the Court should deem that to be wise—a question on which, of course, we intimate no view.

should be regarded as a reorganization statute enacted under the bankruptcy power or as a statute enacted under the commerce power or as both. For reasons there developed, we deferred decision until after the final round of briefing and argument called for by our June 16 Memorandum.

. The issue has lost much of what once seemed to be its significance because of the concession of the Government parties (Brief at 12):

> We do not contend that the Act cannot involve a "taking" or that the Fifth Amendment standard differs depending on which powers Congress invokes.

*See also id.* at 14–15. Indeed, it now appears that the chief, if not the sole, importance of the question how far the Act is a reorganization statute may be in its bearing on the issue framed in our notice of April 14, 1977:

> whether payment in the manner provided in the Rail Act, namely, that net liquidation value shall be paid in securities of ConRail and certificates of value and that only the excess of constitutional minimum value, if any, as finally determined, shall be paid in cash, is constitutional.[2]

A large step toward answering this question was taken by the Supreme Court in the *Rail Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42

L.Ed.2d 320 (1974). The plaintiffs there asserted

> that the Rail Act is basically an eminent domain statute and, because compensation is not in cash but largely in stock of an unproved entity, will necessarily work an unconstitutional taking. A variant of the argument is that, even if a reorganization statute, the Rail Act would be unconstitutional unless the Tucker Act remedy is now held to assure payment of any amount by which the *market value* of stocks and securities awarded by the Special Court is less than the value of the rail properties conveyed.

419 U.S. at 137, 95 S.Ct. at 355 (emphasis in original; footnote omitted).[3] The Court held that the bankruptcy power authorized Congress to provide a mix of ConRail securities and USRA obligations in payment for the properties to be conveyed to ConRail [4] and that any taking compensable in cash was limited to the "shortfall" between the value of the properties and the value of the consideration which the Rail Act provided, 419 U.S. at 150–56, 95 S.Ct. 335. Although, as a result of the 1976 amendments' substitution of the certificates of value (CV's) for the USRA obligations provided in the Rail Act as initially adopted,[5] the "shortfall" will

**2.** The Notice also requested discussion whether a distinction should be drawn between bankrupt and nonbankrupt transferors or between specific classes of nonbankrupts.

Briefs were received on June 1 and reply briefs on June 22, 1977.

**3.** The Supreme Court elsewhere stated that the plaintiffs' "principal contention" was, in part, that the ConRail securities and USRA obligations and other benefits to be received would not be the constitutionally required equivalent of the rail properties compelled by § 303(b) to be transferred. 419 U.S. at 117–18, 95 S.Ct. at 346. *See also id.* at 147, 95 S.Ct. at 360:

[W]e hold ripe for adjudication the questions . . . whether stocks, however valued, can be part of the .consideration for the rail properties . . . .

**4.** In light of the Government's concession referred to above, the problem of the respective reaches of the bankruptcy and commerce power has no practical importance with respect to properties conveyed to profitable railroads or to states. In those instances, the transferors

will receive compensation in cash from the transferees. *See* Sections 206(d)(2), 303(a)(2). If this Court finds that the terms of any such transfer are not fair and equitable, it is to enter a judgment against the transferee. Section 303(c)(3). The United States will be required to indemnify the transferee against the costs of any such judgment. Section 303(c)(5).

**5.** Section 210 of the Regional Reorganization Act of 1973 authorized the Association to issue obligations, guaranteed by the Treasury, not to exceed $1.5 billion, of which $500 million could be used for acquisition of the properties of railroads in reorganization. *See* H.R.Rep.No. 93–744, 93d Cong., 1st Sess. 60 (1973). The 1976 Amendments limited the amount of USRA obligations, restricted their use to loans pursuant to § 211, and created certificates of value. We described the workings of these certificates in our June 16 opinion, 425 F.Supp. at 276–77. In essence, they are a means of ensuring that the transferors receive obligations carrying the full faith and credit of the United States for the net liquidation value (NLV) of their property,

be different and in all probability, less, the Supreme Court's analysis remains broadly applicable.

Various transferors [6] point out that the only estate before the Court in the *Rail Act Cases* was the Penn Central (PC) and that the decision thus is not conclusive on other bankrupt estates and certainly not on the nonbankrupts. Certain bankrupt transferors contend that while the Court could fairly have concluded that the Rail Act was in part a reorganization statute as to the PC in view of its preponderant share in the properties to be conveyed to ConRail and the ConRail securities to be received, the situation of the other lines is quite different since the ConRail securities will represent predominantly the earning power of PC's transferred properties whereas their properties may have proportionately higher earning power and that this disparity would not necessarily be taken care of by the allocation of the ConRail securities issuable in consideration of the conveyances since they would still be afflicted by the assumed low earning power of the PC assets. The non-bankrupt transferors repeat this argument and further contend, citing *Callaway v. Benton*, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553 (1949), that the bankruptcy power does not extend to them; they refer to the Government's concession on the 180-Day Appeals, which we have permitted it to withdraw, *Norwich & Worcester R.R. v. United States*, 408 F.Supp. 1398, 1405 (Sp. Ct.1976), "that no contention was being made that the acquisition of rail properties from nonbankrupts would be on any other than an eminent domain basis," *see* Final System Plan (FSP), Vol. I at 127–28.

The first contention need not detain us long. While the Supreme Court's decision is conclusive only with respect to PC, the Court was well aware that the Rail Act operated similarly with respect to the other bankrupt railroads, *see* 419 U.S. at 108–17,

95 S.Ct. 335; if the Court had thought that the Rail Act must be characterized differently as to the other bankrupt estates, it surely would have said so or at least entered a *caveat*, particularly since in our opinion in the 180-Day Appeals, 384 F.Supp. 895, 951–52 (Sp.Ct.1974), with which the Court was entirely familiar, we had dealt with and rejected a contention very similar to that here considered. Far from qualifying its holding, the Supreme court flatly stated,

> [W]e believe that there is nothing in the Act fundamentally at odds with the expressed purpose of Congress to supplement the reorganization laws, see H.Rep. 29, and, with the Tucker Act, the Rail Act is valid as a reorganization statute.

419 U.S. at 150, 95 S.Ct. at 362.

■ In contrast, the nonbankrupts are right in saying that, in light of the concession of the Government parties in the 1974 proceedings, noted in the portion of this Court's opinion written by Judge McGowan, 384 F.Supp. at 963–64, that any taking of their properties under the Rail Act would be an exercise of eminent domain, our decision in the 180-Day Appeals cannot be read as holding that as to them the Act was in part a reorganization statute and that a taking occurred only with respect to the "shortfall" between the constitutional minimum value of their property and the value of the consideration they ultimately will receive. We shall likewise assume in their favor that the Supreme Court did not consider whether its analysis would apply to them. However, we now hold that as to them also the Rail Act is a valid reorganization statute and that payment may be made in securities of ConRail and CV's with cash payable only for any "shortfall." While Congress recognized the distinction between bankrupt and nonbankrupt railroads, *see* § 303(c)(1)(A), and directed this Court to make separate findings regarding the con-

---

independent of the Tucker Act remedy for any excess of constitutional minimum value (CMV) over NLV. Indisputably the transferors are better off with the CV's than with the limited amount of guaranteed USRA obligations they could have received under the 1973 Act.

**6.** We include in the word "transferors" the intervenors allied in interest with them, 425 F.Supp. at 288.

stitutional minimum value of profitable railroads, see H.R. Rep. No. 93–744, *supra* at 59 (1973), the Act in other respects applies equally to the rail properties of "railroads in reorganization in the region," § 206(c)(1), and to "railroads leased, operated or controlled by any railroad in reorganization in the region." *Id.*

██ The nonbankrupts had agreed that their properties should be operated, in most cases for many years, as an integral part of railroad systems that are now bankrupt. These roads depended financially on rental or similar payments from the bankrupts. Most, although not all, were controlled by the bankrupts, a considerable number to the extent of being wholly owned.[7] As the Government parties note (Brief at 246, n.286):

> Few of the nonbankrupts employed their own personnel or operated their own rolling stock; and most, according to their financial statements, passively received income from sources such as rentals, dividends, interest, and the sale of property. Many were "profitable" only because they continued to state uncollected rentals as income.

The nonbankrupts formed an integral part of the bankrupt systems; indeed the shipping and traveling public had no notion of their separate existence. Most of them had no rolling stock and for this and other reasons could not be operated except in connection with the bankrupt system of which they had so long formed a part;[8] to the extent that they could have resumed independent operations, this is one of the options foreclosed by the Rail Act to be considered in determining the NLV and CMV

and, accordingly, the extent of the "shortfall." In exercising the bankruptcy power Congress may act on the basis of reality rather than under the constraints of corporate forms that had no substantial meaning to anyone until the northeastern railroads underwent a financial crisis which imperiled their continued operation in the public interest. It is appropriate to quote Mr. Justice Sutherland's remarks in *Continental Bank v. Chicago, Rock Island & P. Ry.*, 294 U.S. 648, 668, 671, 55 S.Ct. 595, 603, 604, 79 L.Ed. 1110 (1935):

> From the beginning, the tendency of legislation and of judicial interpretation has been uniformly in the direction of progressive liberalization in respect of the operation of the bankruptcy power.
>
> . . . And these acts, far-reaching though they may be, have not gone beyond the limit of congressional power; but rather have constituted extensions into a field whose boundaries may not yet be fully revealed.

*Cf. Capital Telephone Co., Inc. v. FCC*, 162 U.S.App.D.C. 192, 195, 498 F.2d 734, 737 (1974), where the court permitted the FCC to "look beyond the corporate entity" in order to achieve the "fair and equitable distribution of radio service" mandated by the Communications Act.

*Callaway v. Benton, supra*, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553, is not to the contrary. As we observed in *Norwich & Worcester R.R. v. United States, supra*, 408 F.Supp. at 1404–05, that case "does not hold at all that the bankruptcy power could not extend to the rail properties of solvent lessors of railroads in reorganization. So far as here relevant, it held only that § 77 of

---

7. Of 52 nonbankrupts, 42 were controlled by primary debtors or their subsidiaries, and 22 of these were 100% owned by primary debtors. Of 31 leased lines, 20 had leased their properties to a primary debtor in perpetuity or for terms of 999 or 990 years, and an additional nonbankrupt was under a 401 year lease.

8. For example, neither the Norwich & Worcester nor the Little Miami railroads had operated their own lines for over 100 years before enactment of the Rail Act. North Pennsylvania Railroad had not operated its line since 1879. As of December 31, 1973, the Norwich & Worcester had three employees. On the same date in 1974, the Northern Pennsylvania also had three employees; the Philadelphia, Germantown & Norristown Railroad had one. And as of December 31, 1975, the Baltimore & Eastern Railroad had three employees, the Little Miami, two. *See Moody's Transportation Manual* (1976).

the Bankruptcy Act did not purport to do so." [9]

The considerations that led the Supreme Court to conclude in the *Rail Act Cases* that securities of ConRail and obligations of USRA might constitutionally be used as payment for the assets compelled to be transferred with a cash award only for any "shortfall" between their value and the just compensation required by the Fifth Amendment, thus support the same conclusion with respect to the ConRail securities and CV's provided for in the amended Act not only as to the PC, the carrier before the Court in the *Rail Act Cases*, but as to all transferors, both bankrupts and nonbankrupts. Indeed, we would reach this conclusion independently. As the Court observed, 419 U.S. at 150, 95 S.Ct. at 362:

> No decision of this Court holds that compensation other than money is an inadequate form of compensation under eminent domain statutes.

The one federal case and the state cases cited by some transferors as so holding are not impressive. Most of them were decided many years ago and evince attitudes reflective of an earlier stage in the development of the economy when compensating a condemnee in securities would force him to resort to an imperfect, discontinuous market to retrieve their value. In some, the state attempted to compensate the condemnee with land, *e.g., Vanhorne's Lessee v. Dorrance*, 2 Dall. 304, 315–16, 2 U.S. 304, 1 L.Ed. 391 (Cir.Ct., Pa. Dist. 1795); *Groce v. Greenville, S. & A. Ry.*, 94 S.C. 199, 202, 78 S.E. 888, 889 (1913); *Reynolds v. State Board of Public Roads*, 59 R.I. 120, 194 A. 535 (1937); *Shurtleff v. Salt Lake City*, 96

Utah 21, 23, 82 P.2d 561, 562 (1938), or by affording the right to use the same or other property taken, *e.g., State v. Smith*, 25 Wash.2d 520, 544–45, 171 P.2d 853, 855 (1946). Other cases were decided under state constitutional provisions which expressly or impliedly required compensation to be paid in money, *e.g., Martin v. Tyler*, 4 N.D. 278, 292–93, 60 N.W. 392, 397 (1894); *Gardiner v. Henderson*, 103 Ariz. 420, 424–25, 443 P.2d 416, 420–21 (1968), and thus have no relevance to an interpretation of the just compensation clause of the Fifth Amendment.

We shall not attempt to discuss in detail all of the decisions the transferors have cited. We note only that the transferors would have us mechanically apply the rulings of these cases while ignoring their underlying rationale—that the compensation required by the Fifth Amendment must be sure and certain and equivalent in value to the property taken. The payment scheme of the Rail Act complies with that requirement. The CV's "constitute general obligations of the United States of America for the payment or redemption of which its full faith and credit are pledged," § 306(a). The value of such a certificate, carrying 8% interest and redeemable not later than December 31, 1987, § 306(c)(1), can readily be computed by reference to other Government obligations for which a wide market exists. The method for determining the market value of the ConRail securities, which is to be deducted in fixing the base value of the CV's, § 306(c)(5), accords with commercial practice; while there is some risk that these securities may be overvalued, there is equal risk that they may be undervalued. Experience has taught us

---

**9.** The nonbankrupts also rely on the statement of the court of appeals in *Benton v. Callaway*, 165 F.2d 877, 882 (5 Cir. 1948), aff'd, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553 (1949), that

> A solvent corporation, which has appeared specially as creditor and lessor in a reorganization proceeding, cannot be constitutionally compelled against its will to convey to the debtor a larger and better title than was granted in the lease.

In our view this reliance is misplaced. The court of appeals had previously noted that, "The jurisdiction of the federal district courts

sitting in bankruptcy is limited to matters conferred by statute expressly or impliedly." *Id.* at 880. The finding that no such jurisdiction over the fee interest in defendant's property had been conferred compelled the conclusion that the district court could not constitutionally order the conveyance, since no court may constitutionally act beyond its jurisdiction. Here, there is no doubt that the Rail Act confers jurisdiction over the property of a nonbankrupt lessor. If the court of appeals meant more than what we think it did, we would be constrained to disagree.

that cash itself may fluctuate in value. Application of the Rail Act, with supplementary resort to the Tucker Act if needed, will afford the transferors "a full and perfect equivalent of the property taken," *Monongahela Navigation Co. v. United States,* 148 U.S. 312, 326, 13 S.Ct. 622, 626, 37 L.Ed. 463 (1893). The Constitution requires no more.

### III. *Net Liquidation Value (NLV)*

We deal in this section with a variety of questions relating to the determination of net liquidation value under § 306 of the Act relating to the certificates of value (CV's). It is well to emphasize that these are questions of statutory construction, not of constitutionality; we will consider the constitutional questions in Part IV.

#### (1) *DOT's contention that NLV is limited to scrap value*

 We begin with the contention of the Department of Transportation (DOT) that the only kind of liquidation contemplated by Congress for the purpose of fixing the face value of the CV's would be a liquidation for scrap. The principal basis for this claim is that when Congress adopted the amended Act in 1976, the only theory of liquidation value which was before it was the discussion in the *New Haven Inclusion Cases,* 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970), which DOT argues proceeded on a scrap value theory. This is an insufficient basis for so restrictive a reading in the absence of any expression by Congress that it meant us to fix NLV on that basis alone. "Liquidation," as used in common speech, connotes all available methods of disposition, including but not limited to disposition for junk.[10] Moreover, the Supreme Court's *New Haven* opinion did not proceed exclusively on a scrap value theory. In its discussion of the Bronx freight yards, the Court found that trackage and electrical facilities in the yard would not have been dismantled, but rather maintained for continued rail use. "It is not rational," the Court stated, "to suppose that the managers of the hypothetical liquidation sale, devoted to obtaining the highest possible price for the assets of the debtor, would have ignored the best use of the yard facilities and stripped them of more than $4,000,000 in value." 399 U.S. at 456–57, 90 S.Ct. at 2092 (footnote omitted). Congress was told in the FSP, Vol. I, at 125, that the Master Liquidation Plan (MLP) assumed "that the estates would be required to sell substantial assets for continued rail use" and that "the liquidation plan postulated by USRA is for an orderly transfer of the transportation services to other railroads. . . ." While the FSP added that "the prices for such sales would be regulated and fixed at the pricing levels which would obtain if all rail operations over the lines of the bankrupts actually ceased and as if the assets of the railroads in reorganization actually were dismantled and disposed of for other uses," *id.,* and that the prices of transfers to other railroads would be "computed as if the estates had actually been allowed to exercise their asserted rights to liquidate by selling all their assets for non-rail uses," *id.,* the FSP furnished no explanation for this strange assumption, and there is no indication that Congress endorsed it.

#### (2) *The transferors' contention that for purposes of determining NLV, the United States may be regarded as a purchaser*

██ At the other extreme, we likewise reject the contention of the Trustees of the Penn Central that the directive in § 306(c)(4) that net liquidation value be "determined by the special court" gives us free rein to incorporate into NLV our guess as to what the United States would have paid for the properties if the Rail Act had

---

10. *Ballantine's Law Dictionary* 743 (3 ed. 1969) broadly defines liquidation as "the winding up of a corporation, partnership, or other business enterprise by converting the assets to money, collecting accounts receivable, paying debts, and distributing the net proceeds, if any among the shareholders, partners, or owners of the business." *Webster's New International Dictionary* 1441 (2 ed. 1960) adopts a similarly general definition, "To convert into cash by selling."

not been enacted.[11] We here rely in considerable measure on the legislative history of § 306, reviewed in Part V of our Opinion of October 18, 1976, 425 F.Supp. at 274–75.

First, the House Report on the 1976 Amendments stated that the Committee concurred with USRA's general approach toward valuation, H.R. Rep. No. 94–725, 94th Cong., 1st Sess. 90 (1975), and intimated that this Court should be guided, although it would not be bound, by that approach:

> While the Committee finds persuasive the Association's particular methodology in arriving at its estimates of net liquidation values, it also recognizes that these determinations must be left to ultimate judicial review and determination.

*Id.* Although, as indicated in the previous section of this opinion, Congress cannot be supposed to have endorsed every statement in the FSP's analysis how NLV would be determined, it surely did not mean us to depart so far from the Association's "particular methodology" as to regard the Government as a prospective purchaser and to guess what it would have paid. As noted above, the FSP stated, "In essence, then, the liquidation plan postulated by USRA is for an orderly transfer of the transportation services provided by the estates *to other railroads.* . . ." Vol. I, at 125 (emphasis added).

Second, we may look to the *New Haven Inclusion Cases* as some evidence of the type of liquidation Congress had in mind for purposes of determining NLV.[12] While, as we have noted, that decision does not support the notion that only scrap value can be considered in determining NLV, it contains no hint that the Federal Government could have been considered as a potential purchaser of the New Haven's assets.

Beyond all this, whatever may be the proper characterization of the role which Congress intended for the United States under the Rail Act, it was certainly not that of a "willing buyer." It would thus be impermissible, as a matter of statutory construction, to take account in fixing NLV of the possibility, probability or, as the transferors would have it, certainty that, failing the Rail Act, the United States would have been obliged to make other arrangements for continued rail service. This would be true even if we were required to take account of that factor in fixing CMV. However, as will be shown in Part IV of this opinion, we are not required or even permitted to determine CMV in this manner. Congress created the CV's to afford a bridge, partial or total, between the value of the ConRail securities and CMV—not to constitute part of a bundle that might exceed CMV, with the consequent need for corrective action by this court under § 303(c)(3).[13] *See* H.R. Rep. No. 94–725, *supra* at 90 ("[T]he Committee believes that the certificates of value will assure to each transferor consideration equal to the requirements of a constitutional minimum.").

---

**11.** The Lehigh Valley Trustee apparently concedes that NLV does not encompass potential sales to the Government. Brief at 6–9.

**12.** Indeed, Congressman Rooney, chairman of the House subcommittee that considered the 1976 amendments, stated on the floor of the House:

> Underwriting all of the provisions of the transfer, this legislation authorizes "certificates of value," which are financial instruments, to guarantee the creditors the net liquidation value of their assets if the new corporation fails. It is this net liquidation value that the Supreme Court in the New Haven case determined was the value of a bankrupt railroad.

121 Cong. Rec. H12754 (daily ed. Dec. 17, 1975).

**13.** Section 303(c)(3) provides in relevant part:

> If the special court finds that the terms of one or more conveyances or exchanges for securities, certificates of value or other benefits are fairer and more equitable than is required as a constitutional minimum, then it shall order the return of any excess securities, [certificates of value,] or compensation to the Corporation or a profitable railroad, State, or responsible person so as not to exceed the constitutional minimum standard of fairness and equity.

**(3)** *The contention of the Government parties that, for purposes of determining NLV, potential sales to other government bodies must be disregarded*

■ This leads us to the renewed contention of the Government parties that in determining NLV, and for that matter CMV, potential sales to other governmental bodies may not properly be taken into account. Just as we see no reason why sales to other railroads for railroad use should be excluded from consideration in fixing NLV, as the Government parties other than DOT now concede, Brief at 72–74, we likewise see no basis for assuming that when Congress spoke of liquidation it meant to exclude sales to public bodies. It must have been known to Congress that there had· been such sales, particularly of commuting lines, and there was every reason to suppose that in the event of such a catastrophe as a general cessation of railway service in the Northeast, states and municipalities would at least endeavor to salvage the lines on which hundreds of thousands of citizens traveled to and from work in the cities. Indeed, other sections of the Rail Act reflect Congressional recognition of the active role state and local governments would assume in ensuring continued rail service. Section 304(c)(2)(C) of the Act provides that rail service may not be discontinued if a financially responsible person "including a government entity," offers to purchase the rail properties in order to continue service. Section 403 provides for federal loans to enable state and local governments to make such purchases. *See also New Haven Inclusion Cases, supra,* 399 U.S. at 450 n.66, 90

S.Ct. 2054 (citing Penn Central negotiations with Connecticut and New York for state takeover of New Haven commuter services).

Of course, if the Government parties were right in their contention that prices payable by public bodies cannot be taken into account in determining CMV, this would argue against taking the possibility of such sales into account in determining NLV for reasons similar to those on which we partially relied in rejecting the notion that NLV could take account of a possible sale to the United States. However, for reasons developed in Part IV of this opinion, we largely reject that contention.

**(4)** *The method for determining scrap value*

As already indicated, although the Government parties other than DOT concede that the transferors are entitled to attempt to prove NLV based on sale of part or all of their property to profitable railroads, the only figures presented to Congress in the FSP contemplated sale for scrap in accordance with the MLP. Vol. I, at 124–26. This plan was more fully described in a report dated March 1, 1976. The report disclosed, as FSP had already done in some degree, Vol. I, at 145–46, that one of MLP's assumptions was that a considerable amount of time after the conveyances would be consumed in obtaining regulatory approvals.[14] Recognizing that the time required in fact would unpredictably differ with the nature of the trackage, the Report assumed a uniform date of January 1, 1979 for the commencement of the winddown.[15]

---

**14.** Specifically, the Report assumed that the railroads could only commence liquidation pursuant to orderly plans that would minimize the impact on the economy, that judicial and regulatory approval of such plans would take from two to nine years, that ICC approval for trackage abandonments would take up to 10 years, and that the time required for orderly transition of services to other railroads and modes of transportation, "a critical factor affecting the willingness of the judicial and regulatory authorities to let liquidation commence," would be 7–10 years. *See* Selected Inputs to Valuation Analysis, I–1 to I–14, in *Valuation Reports*

of *Properties Subject to the Regional Rail Reorganization Act of 1973* (1976).

**15.** Winddown is defined as "a period of intense activity associated with the promulgation of freight and passenger embargo notices and the preparation for ending railroad operations." *See* Master Liquidation Plan and Summary of Valuation Reports, at 7–10, in *Valuation Reports, supra.* The period lasts 90 days, followed by a 180 day period, commencing April 1, 1979, for consolidation of inventories of rolling stock, materials and supplies, and other nonfixed assets. Sales of rolling stock would begin on April 1, 1979, and sales of dismantled

At the oral argument in April, 1977, counsel for the Government parties advised the court that they no longer considered valid the assumption of a three year delay before the sale program could begin and that they were developing an alternative approach. In response to the court's request that the Government parties promptly inform it and the other parties of significant changes contemplated in MLP, the Government parties filed a statement on July 5, 1977. MLP will now eliminate any assumption that any time after April 1, 1976 would have to be spent in securing abandonment authority.[16]

The parties appear to agree that most issues concerning the methodology of the MLP are not yet ripe for decision—a rather obvious conclusion since MLP is still evolving. However, the Government parties have asked us to uphold the validity of the model for purposes both of NLV and CMV insofar as it pre-supposes a coordinated method of withdrawal. In contrast, the transferors seemingly invite us to rule that the model is invalid on precisely this account, since the scrapping of one railroad, particularly if PC were the one, might avoid any need for scrapping others. We decline both invitations.

The Government parties stress that what they term the "retrieval model" embodied in the MLP assumes the presence of the Rail Act and apparently argue that this requires a hypothesis of simultaneous withdrawal. It is surely true that the Rail Act compelled the operation of all the roads until April 1, 1976 and the cessation on that date of operations over the mileage that was transferred, with a consequent fulfillment of *"Brooks-Scanlon* rights" at that time. But, as developed in our CUE opinion, 439 F.Supp. at 1372, the railroads were constitutionally entitled to cease operations after a reasonable period for securing abandonment authority on applications which (save in the case of EL) would have been filed in early 1973 but for the discussions leading up to the Rail Act. Since the Rail Act foreclosed this right, each transferor must be allowed to prove, if it can, that exercise of this right, even in the form of a sale for scrap, would have yielded more than MLP.

A transferor cannot, of course, realistically assume that it would have been operating in a world where it was the only railroad engaged in a liquidation for scrap. If it presents a plan which does not appropriately allow for this, the Government parties can object on that account. By the same

---

facilities on July 1, 1979, continuing for a considerable time thereafter.

**16.** This concession is due to the fact that MLP, now styled the "retrieval model," assumes the existence of the Rail Act. Since the compelled conveyances constituted a maturation of the carriers' *"Brooks-Scanlon* rights," see 180-Day Appeals, 384 F.Supp. at 918–20; CUE opinion, 439 F.Supp. 1351, 1368–69, 1373, the Government parties no longer insist on assuming the need for further regulatory approvals for scrapping the properties—although they continue to insist that regulatory delays after April 1, 1976 must be taken into account in any "alternative scenario" which involves sale of part or all of the properties for rail use and, if only part were so sold, for the scrapping of the rest. While it might seem that this changed assumption would substantially increase the scrap value figure, since the reports assumed a pre-tax discount rate of 13% for property other than real estate and 16% for real estate, much of the bloom is taken off the rose by the following qualification (p. 10):

The Government Parties' conclusion that, for retrieval model purposes, the transferors must be deemed to have certificates of abandonment in hand on April 1, 1976, does not undermine the validity of the concept of using a computational proxy to model a multi-date process. The validity of any particular proxy date depends, of course, upon (a) the nature of the gradual process for which the proxy substitutes, and (b) a fair valuation equivalence between the present value of the net proceeds produced by the gradual process and that produced by use of the proxy date. USRA has commissioned a study to determine an appropriate proxy date in light of the elimination of any pre-availability delay after March 31, 1976, attributable to the need for abandonment approvals, as well as possible changes in USRA's valuation of particular asset categories. Preliminary results of the study suggest that the new proxy date may be earlier than January 1, 1979.

token, we see no reason why the Government should not be permitted to come forward with figures based on MLP, as it may be revised, since at the least this shows what one possible method of disposition for scrap would have been. What is important is that the transferors should now make known what they intend to advance as their scrap liquidation plans, so that the Government parties will know what cases they will be obliged to meet. We direct that each transferor should serve and file such a plan not later than December 9, 1977.[17] While most of the revisions of MLP have been promised by this fall, we are distressed that some (real restate valuations and a variety of other studies including the highly important subject of discount rates) will not be ready until 1978. We direct that the Government parties make every effort to expedite this work.

(5) *The method for determining values attainable on sales for railroad use*

The Government parties concede (Brief at 74) that:

Any transferor is entitled to attempt to show that it had (before the Rail Act was passed) and would have exercised (had the Rail Act not been enacted) a right to take some specific course of action to realize rail use values from its properties.

However, the Government parties insist, *id.,* that any endeavor on the part of transferors to show that such a course would have produced values exceeding the sale of their properties for scrap must conform to an "alternative scenario." They say this must meet four criteria: "(1) consistency, (2) feasibility, (3) legality, and (4) the assumed absence of the Rail Act or any other new governmental action designed to keep the rail properties indefinitely in operation." (Govt. brief at 77). Application of the last of these criteria would, in practical effect, make presentation of an alternative scenar-

io impossible since, as appears from our CUE opinion, 439 F.Supp. at 1376, 1383–84 nn.59 & 60, 61, many transferors claim they would have reached the point of cashlessness in early 1974 and Erie Lackawanna (EL) claims it would have reached this point in the winter of 1975 absent the emergency assistance provided by the Rail Act.

At oral argument Government counsel relented in some important respects from the rigidity of the position taken in brief. The Government indicated that it would not demand proof that the transferors had received actual offers at identifiable prices. This might well be difficult to show in view of the fact that once serious discussion of what was to become the Rail Act began in the winter of 1973, profitable railroads had little incentive to conduct discussions directly with the various reorganization trustees. Hence it would be enough to show that, in the phrase used by counsel for EL at oral argument, profitable railroads should in their "own self interest" have wished to purchase various lines of the transferors. On the point mentioned at the end of the preceding paragraph, the Government parties also conceded that an alternative scenario might legitimately assume that the Government would have provided emergency assistance in some form for a reasonable period "to permit adequate ICC review of the abandonments or transfer applications," Transcript at 296, and to avoid liquidation "in chaos," Transcript at 283. Furthermore, counsel for the Government parties did not exclude the idea that the alternative scenario could take account of possible regulatory reforms including those made by the Railroad Revitalization and Regulatory Reform Act of 1976, which would have made purchases more attractive.

We believe these concessions were well advised; indeed they may not constitute the limit. If the Rail Act had not been passed, Congress still would have had powerful in-

---

**17.** If the transferors would prefer a course whereby they would seek to coordinate their scrap liquidation plans before disclosing them to the Government parties and the court, similar to what we later direct in connection with sales for rail use, *infra* pp. 1009–1010, we will

entertain a proposal to modify the above direction accordingly. So also if the transferors should elect to forego the submission of any plans calling for a solely scrap liquidation and to integrate scrap sales with sales for railroad use.

centives to attempt to preserve at least some of the rail transportation previously furnished by the bankrupt entities in the Northeast and to make reasonable funds available to the reorganization trustees while studies were being prepared and negotiations with other railroads were proceeding; the parties will doubtless differ whether these would have been loans or grants. Although the Government parties may well be right in saying that the transferors cannot legitimately hypothesize that Congress would have done more in the way of interim financial aid to keep the bankrupt estates alive pending negotiations with other railroads than it did in the Rail Act pending the development and consummation of the FSP, the Government equally cannot sustain the proposition that Congress would simply have sat by and done nothing.

However, the Government parties have not receded from their most basic position relating to the alternative scenario, namely, the requirement of consistency. For example, they would insist, with r⸱ason, that it would be improper to fix NLV or CMV on the basis that a number of transferors would have been able to sell lines connecting the same points to a single profitable railroad when that railroad would have wished only one, or to assume that a particular line would have substantial traffic because a parallel line was being dismantled and then to make the same assumption in valuing the parallel line. From this premise, the Government parties go on to insist (Brief at 81) that "all transferors seeking to show rail use values for particular lines should be required to set forth explicitly their underlying assumptions about all other lines whose dispositions would bear on their properties' value." As a practical matter, this would seem to require a joint presentation by all transferors proposing to offer evidence of higher values attainable by sales for rail use.

Such a course of action by the transferors would surely be desirable and, at the conclusion of the oral argument on April 13, we suggested that the transferors should not await the issuance of this opinion but should begin conversations among themselves with a view to seeing whether a unified alternative scenario could be developed and to report to us if any progress along these lines had been achieved. We have received no report as to what, if anything, has been done. While we believe that, as in the case of sales for scrap value, each transferor is entitled to make its own proffer as to what it would and could have done by way of sales for rail use, the Government parties are right in saying that a most difficult problem will be presented if transferors make basically inconsistent proposals. It is in everyone's interest that all reasonable efforts should be made to eliminate or at least to reduce these inconsistencies. We therefore direct that any transferor seeking to present evidence of values to be obtained by sales for rail use shall exchange its proposal with all other transferors not later than January 9, 1978; that the transferors shall then meet among themselves with a view to a maximum ironing out of inconsistencies; that they shall deliver their proffers, as these may be revised in the light of such discussions, to the Government parties on a date not later than March 9, 1978; that the Government parties shall indicate any objections on the score of inconsistency within another 30 days; and that finally revised proffers shall be filed with this court not later than 30 days after the transferors' receipt of the Government's objections. We do not deem it practical at this time to specify the level of detail to be contained in such proffers, beyond saying that they should be sufficiently particularized to be meaningful.

■ We also agree with the Government parties that the proffers of sale for railroad use must meet the criterion of legality. In saying this, however, we would not wish to be understood as ruling that the transferors must carry the burden of showing that the proposed transactions would have been approved by the Interstate Commerce Commission under criteria which the ICC had evolved in dealing with sales of profitable railroads. The Commission would have been confronted with a situation quite un-

like those with which it had been presented in previous merger cases. Just as the anti-trust laws have received a different application in the case of the acquisition of a failing business, *International Shoe Co. v. FTC*, 280 U.S. 291, 301–02, 50 S.Ct. 89, 74 L.Ed. 431 (1930); *Citizen Publishing Co. v. United States*, 394 U.S. 131, 136–38, 89 S.Ct. 927, 22 L.Ed.2d 148 (1968); Department of Justice Merger Guidelines ¶¶ 9, 15, 21 (1968), *reprinted as amended in* 1 Trade Reg. Reptr. [CCH] ¶ 4510, the Commission would have been permitted, indeed required, to apply different criteria, particularly as to the preservation of competition within the Northeast Region and of competitive balance outside it, when it was confronted with a situation where the alternative to some sort of approval would have been the cessation of substantially all railroad operations in the Northeast. There is also the possibility that if the Commission showed signs of an undue tendency to proceed along traditional lines, Congress might have stepped in. Thus, we do not at all exclude such possibilities as joint action by the transferors in the Northeast Region or joint purchases by profitable railroads to the west and south which ordinarily might have been deemed objectionable under the antitrust laws.

Finally, we record our disagreement with the suggestion of the Government parties that the Interstate Commerce Commission would or could have used its power to withhold approval so as to insist on the inclusion of unprofitable mileage to a degree that would have driven down the price that purchasers would pay to the level of scrap value, a view which now appears to have been the basis for the extracts from FSP, Vol. I, at 125, cited above, p. 1004.[18] We do not intimate that the Commission would have had no alternatives other than complete acceptance or rejection of the proposals as made. On the other hand, the suggestion that the Commission would or legally could have required purchasers to take on more and more unprofitable mileage on the basis that no harm was being done to the transferors so long as the purchase price was no less than scrap value appears to us to be unsupported by authority[19] and in

---

18. We rejected an argument that was a variation on this theme in the October 18 opinion, 425 F.Supp. at 271–73.

19. In one of the cases cited, *Jamestown, W. & N. R.R. Abandonment*, 217 I.C.C. 739 (1937), the Commission refused to approve the sale of certain terminal properties to the Erie Railroad on a condition that would have required the Jamestown actually to abandon 31 miles of mainline track and thus deprive the city of Jamestown of railroad connections with three other competing carriers. When the Erie withdrew the condition, the Commission approved the sale without any effort to force the Erie to acquire and operate the track. *Erie R.R. Trustees' Purchase*, 244 I.C.C. 13 (1941). In another case, *Abandonment of Part of Line by Gulf Ports Terminal Ry.*, 111 I.C.C. 597 (1926), the ICC merely required the abandoning railroad to accept any offer by a purchaser willing to continue all the properties in rail use that would *match* the highest offer received from a buyer which planned to operate some properties and dispose of the rest for nonrail use. The Commission did not speak of a prospective buyer which would be forced to operate properties it did not wish to operate.

Cases cited by the Government parties for the general proposition that conditions may be attached to an abandonment, *ICC v. Railway Labor Exec. Ass'n*, 315 U.S. 373, 62 S.Ct. 717,

86 L.Ed. 904 (1942); *Reed v. Meserve*, 487 F.2d 646 (1 Cir. 1973), and ICC decisions specifically conditioning abandonment on the imposition of labor protective measures, *Chicago, B. & Q. R.R. Abandonment*, 257 I.C.C. 700 (1944); *Fort Dodge, D.M. & S. Ry Abandonment*, 257 I.C.C. 700 (1944); *Fort Dodge D.M. & S.Ry. Abandonment*, 312 I.C.C. 708 (1963), aff'd, *Humphreys v. United States*, 228 F.Supp. 910 (N.D.Cal. 1964); *East Carolina Ry. Abandonment*, 324 I.C.C. 506 (1964); *Missouri-Kansas-Texas R.R. Abandonment*, 338 I.C.C. 728 (1971); *Penndel Co. Abandonment*, 342 I.C.C. 570 (1973), furnish no authority for the position of the Government parties. Nor do § 5(2) of the Interstate Commerce Act, or cases decided thereunder, *e.g., New York Central Securities Corp. v. United States*, 287 U.S. 12, 28, 53 S.Ct. 45, 77 L.Ed. 138 (1932); *Thompson v. Texas Mex. Ry.*, 328 U.S. 134, 149–50, 66 S.Ct. 937, 90 L.Ed. 1132 (1946); *Penn Central Merger Cases*, 389 U.S. 486, 495–96, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968), furnish analogical support for the proposition that the ICC can require a prospective buyer to operate properties it did not wish to and could not economically operate. Section 5(2) by its terms authorizes inclusion only of "another railroad" in a merger, and then only upon petition of that railroad. 49 U.S.C. § 5(2)(d). The section thus authorizes inclusion where a separate, third-party railroad

effect to negate the concession that sales for continued rail use would have been a permissible, indeed the preferred, form of liquidation.

## IV. *Constitutional Minimum Value (CMV)*

The basic position of the Government parties is that CMV is the market value of rights of which the transferors were deprived by the Rail Act. These would include (1) the right to use their properties for a profit and (2) the right to sell the properties for continued rail use by others or, failing this, for scrap.[20] While conceding the existence of (1) in principle, the Government parties consider it to be largely if not wholly theoretical on the submissions that have been made to date, since nearly all transferors have asserted, notably in

their briefs on CUE, that their properties were hopelessly losing and were destined to remain so.[21] As already indicated in Part III, the Government parties further submit that scrap value should be determined in accordance with a Master Liquidation Plan (MLP) and insist that proposals in regard to sale for rail use should conform to a single "Alternative Scenario."

While the transferors attack the MLP and the demand for a single Alternative Scenario on the grounds indicated in Part III of this opinion and others, their major contention with respect to CMV is that the entire approach of the Government parties is wrong. Pointing to numerous declarations of members of the executive and legislative branches during the consideration of the Rail Act and to recitals in the Preliminary System Plan,[22] they assert that even a

seeks to participate in a merger transaction initiated by others; we have been cited no authority that, if some of the third party's lines were profitable and others were not, the Commission could insist that hopelessly unprofitable lines must continue to be operated and reduce the price payable to the third party to reflect this. Indeed, the portion of the Supreme Court's *New Haven* decision relating to the Bronx freight yards, p. 1004 *supra*, indicates the contrary.

20. The presentation of the Government parties has been complicated by persistent argument on what they call "ConRail use value." The point of this is that under the Rail Act the transferors receive all the junior securities of ConRail, so that whatever earning power ConRail possesses after payment of the charges on its debt and Series A preferred stock (or payment and redemption thereof) will belong to the transferors. While this is true for the properties transferred to ConRail taken as a whole, there may be lines which could now be operated at a profit, and some which after rehabilitation might attain that state sooner than others. Furthermore, the argument has no application to properties conveyed to persons other than ConRail, for which no ConRail securities are issuable. We thus fail to see that "ConRail use value" has great significance except as a shorthand way of stating that the conveyances compelled by the Rail Act differ from those usual in condemnation in that the transferors do retain upside potential if the properties should turn out to have earning power not reflected in the value of the ConRail junior securities at the redemption date of the CV's.

21. The Government parties other than the DOT further suggest that as a practical matter any

value in possible retention for rail use by a particular transferor would be reflected in value for sale to others for rail use. This is not necessarily true since while capitalized earning power would be what a seller would ask, it is not inevitably what a buyer would pay. The small number of prospective buyers, pressure on the seller to dispose of the property, and discrepancies in the information possessed by the parties to the transaction are some of the factors that would make the Government parties' "perfect market" outcome unlikely.

22. The House Committee Report on the Rail Act observed that

The services [that the bankrupt carriers] perform are essential to the nation, and the blow to the economy if such services were interrupted only briefly, would be devastating. This is a matter which affects not only the economy, but also the defense needs of the nation.

H.R. Rep. No. 93–620, 93d Cong., 1st Sess. 28 (1973). The Senate Report was equally apocalyptic:

[The carriers'] services are not only essential to the prosperity and well-being of the people and industry in the Northeast and Midwest, but they are essential to the well-being and prosperity of the Nation as a whole. Cessation of services on the Penn Central alone would have drastic consequences throughout the United States. For example, it has been predicted that a shut-down of the Penn Central would produce a decrease in the rate of economic activity in the region of 5.2%, a decrease in the entire Nation of 4%, and a decrease in GNP for the Nation as a whole of

temporary, let alone a permanent, cessation of their operations would have caused such economic and environmental problems as to be unthinkable. They say that the value of properties which have this crucial importance to the nation but which can no longer be operated at a profit, at least in part because of national and local regulatory and promotional policies and demands, cannot be limited to what could be obtained by way of sale to private or even other public bodies. They therefore urge that, in fixing CMV, we must "consider," with what weighting is not altogether clear, many factors other than the market value of the rights of which the transferors have been deprived. These include such concepts as gross liquidation value, original cost less depreciation, trended original cost less depreciation reproduction cost less (or even without) depreciation, assemblage value, the value of "externalities," and "societal value." In an attempt to conform these concepts more nearly to the conventional wisdom that property being condemned is generally to be valued on the basis of what a willing buyer would pay a willing seller, the reply brief of the PC Trustees envisions a bargaining process in which the buyer would begin by offering an amount equal to value for continued rail use for some properties and scrap value for others, knowing that the seller would not take less, and the seller would begin by demanding reproduction cost less depreciation, knowing that the buyer would not pay more, and bargaining would then ensue.[23] This has the further

effect of bringing CMV in line with NLV and thereby avoiding the need for proceedings in the Court of Claims.

■ Before going further it is useful to comment on what seems to us to be a difference in the concept of "property" held by the Government parties on the one hand and certain transferors on the other. Some transferors challenge the Government parties' valuation theory at a fundamental level by arguing that what was taken, and what must be valued, is "property," not "rights" to use or sell or, in a favorite phrase of the Government, "foreclosed options." If they mean by this that the Government's "foreclosed option" approach is only a valuation standard rather than a description of what was taken and that we should begin our valuation analysis on the premise that "property" rather than certain "rights" were taken,[24] our answer is that the definition of what was taken is so closely related to the valuation question that the two cannot be treated separately, see Bonbright, Valuation of Property 99 (1937) (hereafter Bonbright); if the point is that "property" is something more or different than certain legally-protected rights,[25] and for this reason alone must be valued on some basis other than by consideration of the rights of which the transferors were deprived, we must disagree. For "property" is nothing more than a collection of rights and can be valued on no other basis; talk of property as having some reified existence simply makes for confusion. See

2.7% after the eighth week of such a shutdown.

S. Rep. No. 93–601, 93d Cong., 1st Sess. 7–8 (1973). The Senate Report concluded that the "entire economy of the United States would suffer drastically if the railroads in the Northeast and the Midwest shut down operations." Id. at 8. See also Hearings on Northeast Rail Transportation Before the Subcomm. on Transportation and Aeronautics of the House Comm. on Interstate and Foreign Commerce, 93d Cong., 1st Sess., pt. 1, at 219 (statement of Claude Brinegar, Secretary of Transportation); 621–23 (policy statement of the New England Governors' Conference); Hearings on S. 281 Before the Surface Transp. Subcomm. of the Senate Comm. on Commerce, 94th Cong., 1st Sess. 1 (1975).

Section 101(a) of the Rail Act reaffirmed this determination of the essentiality of the Northeast rail system. The Preliminary System Plan, as well, recognized the "devastating implications for the regional and national economy" of shifting freight to other modes of transportation. Vol. I, at 139.

**23.** A similar proposal had been presented in the Opening Brief of the NH Trustee. Brief at 59–73.

**24.** As the PC Trustees at one point apparently do. See Reply brief at 20–21.

**25.** See PC reply brief at 16–20; CNJ reply brief at 17–18; LV reply brief at 12–13.

*Ackerman, Private Property and the Constitution* 26–27, 201–03 (1977), and numerous sources cited therein; 2 *Nichols, Eminent Domain* § 5.1[1], at 5–8 to 5–10 (3d ed. 1976); Cohen, *Property and Sovereignty*, 13 *Cornell L.Q.* 8, 11–12 (1927); *cf. Bonbright* at 100–08. As Mr. Justice Roberts said for the Court in *United States v. General Motors Corp.*, 323 U.S. 373, 377–78, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945), a condemnation case:

> It is conceivable that the [term "property" in the just compensation clause] was used in its vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. On the other hand, it may have been employed in a more accurate sense to denote the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it. In point of fact, the construction given the phrase has been the latter.

(Footnote omitted).[26] *See also United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 81, 33 S.Ct. 667, 57 L.Ed. 1063 (1913), and *Boom Co. v. Patterson*, 98 U.S. 403, 408, 25 L.Ed. 206 (1878).

Some of the transferors argue for a constitutional minimum value in excess of what could have been obtained by sale to private entities or governmental bodies other than the United States on the basis that the United States should be included in the market, while others argue that in the peculiar circumstances of this case the ordinary willing seller-willing buyer approach is simply inappropriate.

In answering the first contention, the Government parties naturally emphasize Mr. Justice Holmes' famous aphorism in *Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195, 30 S.Ct. 459, 460, 54 L.Ed. 725 (1910), "[T]he question is what has the owner lost not what has the taker gained." That statement alone, when read in context, does not greatly aid the Government parties since it was made in rejecting a claim that the owner of land being taken by Boston for use as a street and the owner of an easement of access could aggregate their interests so as to produce a larger value than if the city took the respective rights of each.[27] However, this was not to be the Court's last word on the subject.[28] In *McGovern v. New York*, 229 U.S. 363, 371–72, 33 S.Ct. 876, 877, 57 L.Ed. 1228

**26.** Although this was said in a case involving the taking of a portion of a lease, so that it was necessary to abandon a "vulgar and untechnical" view of property as a "physical thing" in order even to find that there had been a taking of property, the Court's analysis in *General Motors* does not become inapposite in a case where the taking involves a more concrete property interest. As Mr. Justice Holmes once noted, "Ordinarily an unqualified taking in fee by eminent domain takes all the interests and as it takes the *res* is not called upon to specify the interests that happen to exist." *A. W. Duckett & Co., Inc. v. United States*, 266 U.S. 149, 151, 45 S.Ct. 38, 69 L.Ed. 216 (1924). Similarly, it is not surprising that courts refer explicitly to the "bundle of rights" theory of property largely when the taking is of something less than all the rights relating to the thing itself, for it is in those cases that judges are forced to clarify basic conceptions of property. *See, e.g., Town of Bedford v. United States*, 23 F.2d 453, 454 (1 Cir. 1927); *United States v. 53¼ Acres of Land*, 139 F.2d 244, 247 (2 Cir. 1943), *cert. denied*, 322 U.S. 730, 64 S.Ct. 947, 88 L.Ed. 1565 (1944); *Adaman Mutual Water Co. v. United States*, 278 F.2d 842, 846 (9 Cir. 1960); *United States v. Certain Land*, 220 F.Supp. 696, 699–700 (D.Maine 1963). *See also United States v. Causby*, 328 U.S. 256, 261–62, 66 S.Ct. 1062, 1066, 90 L.Ed. 1206 (1946), where the Court reasoned that there would be a taking of property if overflights rendered the land uninhabitable since "[t]he owner's right to possess and exploit the land— that is to say, his beneficial ownership of it— would be destroyed."

**27.** As pointed out in *Orgel, Valuation Under Eminent Domain* § 88 (2d ed. 1953) at 365 (hereafter *Orgel*), it is not clear what the relevance of the value to the taker point was in the case, since the land was worth the same to the city regardless of whether the owners' claims were aggregated.

**28.** We omit discussion of *United States v. Chandler-Dunbar Co., supra*, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063, because of the many conflicting inferences that can be drawn from the opinion. See the discussion in *Orgel* § 88 at 365–70; *see also* Note, *Valuation of ConRail Under the Fifth Amendment*, 90 Harv.L.Rev. 596, 600 n.20 (1977).

(1913), the New York courts had upheld the exclusion of evidence to prove the enhanced value of the land taken as part of a natural reservoir site and also the "fair and reasonable value of the Ashokan reservoir site which the city is condemning," of which the land taken was a part. In affirming, Mr. Justice Holmes said:

> It is conceded 'that the owner is not permitted to take advantage of the necessities of the condemning party,' and it would seem that it might well be that the commissioners regarded it as too plain to be shaken by evidence, on the public facts, that the value of the land for a reservoir site could not come into consideration except upon the hypothesis that the City of New York could not get along without it and that its only means of acquisition was voluntary sale by owners aware of the necessity and intending to make from it the most they could. *It is just this advantage that a taking by eminent domain excludes.* (Emphasis supplied).

The italicized statement is not inconsistent with remarks in *McGovern* and other cases, *City of New York v. Sage*, 239 U.S. 57, 61, 36 S.Ct. 25, 60 L.Ed. 143 (1915); *Olson v. United States*, 292 U.S. 246, 256, 54 S.Ct. 704, 78 L.Ed. 1236 (1933); *United States ex rel. TVA v. Powelson*, 319 U.S. 266, 275–76, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); *United States ex rel. TVA v. Powelson*, 138 F.2d 343 (4 Cir. 1943), *cert. denied*, 321 U.S. 773, 64 S.Ct. 612, 88 L.Ed. 1067 (1944), upholding recognition of special suitability of the property taken for the governmental purpose if the owner had the ability to unite his land with other parcels essential to the project and the properties could have been put to the desired use without a taking by the particular condemnor.

In *United States v. Miller*, 317 U.S. 369, 375, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943) (footnotes omitted), the Court made a statement having the same sweep as its earlier one in *McGovern* :

> Since the owner is to receive no more than indemnity for his loss, his award cannot be enhanced by any gain to the taker. Thus although the market value of the property is to be fixed with due consideration of all its available uses, its special value to the condemnor as distinguished from others who may or may not possess the power to condemn must be excluded as an element of market value.

To be sure, the point covered by this statement was not in controversy. The issues were whether the owner should have "the benefit of any increment of value added to the property taken by the action of the public authority in previously condemning adjacent lands," *id.*, to which the Court answered that he should, except for an increment "arising from the known fact that the lands probably would be condemned," *id.*, 317 U.S. at 377, 63 S.Ct. at 281; and whether the lands in question "[were] so situated as to entitle respondents to the benefit of this increment," *id.*, at 375, 63 S.Ct. at 281, to which the Court answered that they were not. Still the holding that value arising solely from the prospect of condemnation must be excluded does seem to hinge on a premise that the taker must be excluded from the market.[29]

---

**29.** An emphatic statement by a lower court to that effect in a case not dissimilar to ours is *United States v. Boston, Cape Cod & N.Y. Canal Co.*, 271 F. 877, 893 (1 Cir. 1921), where, in ruling out evidence of the military and naval value of the condemned canal to the United States, the court said:

> We are of the opinion that, in ascertaining the market value of property taken in a condemnation proceeding the utility or availability of the property for the special purpose of the taker cannot be shown, if the taker is the only party who can use the property for that purpose. If, however, the property has a special utility or availability, not only to the taker, but to other parties who could use the property for the particular purpose intended by the taker, then this utility or availability may be shown.

*See United States v. Foster*, 131 F.2d 3, 6 (8 Cir. 1942), *cert. denied*, 318 U.S. 767, 63 S.Ct. 760, 87 L.Ed. 1138 (1943) ("The value of the land taken to the party taking it is not the test but its value to the owner or the loss caused to him by its taking."); *United States v. Catlin*, 204 F.2d 661, 664–65 (7 Cir. 1953) (instruction that jury could not consider the government's use of the condemned land for an ordinance depot in valuing the property was proper). *See*

The Government parties rely also on statements that the just compensation clause demands indemnification and nothing more. Thus the Court said in *United States v. Miller, supra,* 317 U.S. at 373, 63 S.Ct. at 279:

> The owner is to be put in as good a position pecuniarily as he would have occupied if his property had not been taken.

and in *United States v. Reynolds,* 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970):

> The owner is to be put in the same position monetarily as he would have occupied if his property had not been taken.

See *Bauman v. Ross,* 167 U.S. 548, 574, 17 S.Ct. 966, 42 L.Ed. 270 (1897); *Olson v. United States, supra,* 292 U.S. at 255, 54 S.Ct. 704; *Westchester County Park Comm'n v. United States,* 143 F.2d 688, 691 (2 Cir.), *cert. denied,* 323 U.S. 726, 65 S.Ct. 59, 89 L.Ed. 583 (1944). These statements gain added meaning when they are read in conjunction with Mr. Justice Frankfurter's opinion in *Kimball Laundry Co. v. United States,* 338 U.S. 1, 5, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765 (1949):

> The value compensable under the Fifth Amendment, therefore, is only that value which is capable of transfer from owner to owner and thus in exchange for some equivalent. Its measure is the amount of that equivalent.

Here, if the "property had not been taken," the transferors would have had, at least so far as now known to us, hopelessly losing railroads, on the verge of "cashlessness." *See* p. 1008, *supra.* The only value "capable of transfer from owner to owner" was the value obtainable by sale to private or governmental bodies other than the United States for continued rail use or by sale as scrap. The transferors answer that the

United States had even greater compulsion to buy than other governmental bodies would have had and that, if we should sustain inclusion of the latter in the market, as subsequently we broadly do, there is no reason to exclude the former.

■ It appears to us, however, that inclusion of the taker in the market, in the sense of here attempting to reconstruct a bargaining process between the transferors and the United States, is inconsistent with the basic principle of eminent domain. While suitability of the property for a public purpose may properly be considered, this will not affect market value unless there is a prospective buyer other than the taker. It would be incongruous if the owner of an abandoned warehouse standing in the way of a contemplated highway or runway, who is relegated to market value if the building possesses some, were allowed the benefit of a hypothetical bargain with the taker because the structure had become so dilapidated as to have no market value at all. The essence of eminent domain is not only that it enables the condemnor to acquire property which the condemnee may not wish to sell but that it allows the condemnor to do this at a cost determinable in accordance with some external standard rather than by hypothesizing a bargaining process in which the condemnor's needs are an element and there is simply no way of determining the point where the bargain would ultimately be struck. *See also* Note, *supra,* 90 *Harv.L.Rev.* at 604. To reiterate Mr. Justice Holmes' statement in *McGovern, supra,* 229 U.S. at 372, 33 S.Ct. at 877, "It is just this advantage [to the condemnee] that a taking by eminent domain excludes."

*also United States v. 46,672.96 Acres of Land,* 521 F.2d 13, 15–16 (10 Cir. 1975).

We see little relevance in *Grand River Dam Authority v. Grand Hydro,* 335 U.S. 359, 69 S.Ct. 114, 93 L.Ed. 64 (1948), since this was a contest between two parties both having the power of condemnation, and since the condemnation issues were decided under Oklahoma law. The Court held merely that the Federal Power Act did not prevent the state court from

admitting evidence concerning the value of the property as a dam site, for which it was condemned. The Court stated explicitly, "[W]e express no opinion upon what would be the appropriate measure of value in a condemnation action brought by the United States or by one of its licensees in reliance upon rights derived under the Federal Power Act." *Id.* at 373, 69 S.Ct. at 121.

■ Thus, the usual meaning of the Fifth Amendment's just compensation clause is that the taker must pay the market value of the property, without considering its own presence in the market. In these circumstances, that rule would value each transferred property at the higher of scrap value or its sales value to parties other than the United States.

## A. Decisions Applying Rules Other than the Market Value Rule

The transferors respond that, however we might view the matter if it were one of first impression, the decisions discussed up to this point have been qualified by others which have established that, in a case like this, a court must consider values beyond those attainable in the market, notably reproduction cost or some variant upon it, whether on the theory of including the condemnor as part of the market or because market value is simply not an appropriate measure of just compensation. The transferors have advanced several lines of decisions to support this argument. We shall consider each of them:

(1) *Takings of property not held for profit*

The transferors refer us to federal cases such as *United States v. Certain Property*, 403 F.2d 800 (2 Cir. 1968), and numerous state court opinions, *e.g., Idaho-Western Railway Co. v. Columbia Conference of Evangelical Lutheran Augustana Synod*, 20 Idaho 568, 119 P. 60 (1911), *County of Cook v. City of Chicago*, 84 Ill.App.2d 301, 228 N.E.2d 183 (1967), *City of Wichita v. Unified School Dist. No. 259*, 201 Kan. 110, 439 P.2d 162 (1968), *Newton Girl Scout Council, Inc. v. Massachusetts Turnpike Auth.*, 335 Mass. 189, 138 N.E.2d 769 (Sup.Jud.Ct.1956), where a condemnor has taken property such as schools, churches, or parks not held for profitable use and the courts have allowed

the owner to recover a sum sufficient to enable him to replace the property. *See 4 Nichols, supra,* § 12.32[3][d]; Note, *Just Compensation and the Public Condemnee,* 75 *Yale L.J.* 1053 (1966); *see also Bonbright* at 419; 1 *Orgel* § 40, at 181–85. One can find in such cases statements like that in *Idaho-Western Railway Co., supra,* 20 Idaho at 583, 119 P. at 65:

> Whenever the property is of such character and nature that it has no market value, its value for the uses and purposes to which it is being devoted and to which it is peculiarly adaptable may be shown
>
> . . . .

There are, as well, statements that appear to support the transferors' position that "[i]n such cases just compensation is arrived at by considering reproduction costs, replacement costs and other measures of value designed to approximate the true worth of the condemned property." PC Lienholders' reply brief at 20–21.

■ Whatever literal application such statements may have and, of course, the railroads here in question did possess *some* market value—the transferors' argument misses the true thrust of these decisions. The basic principle, as the Supreme Court said in the extracts from the *Miller* and *Reynolds* opinions quoted above, is that the owner is entitled to be put in as good a position as if the taking had not occurred. This means, in situations such as those here under discussion, being provided with the funds needed to build another school or church or to create another park.[30] In *United States v. 564.54 Acres of Land*, 506 F.2d 796, 800 (3 Cir. 1974), the court stated:

> The community entity is entitled to be made whole, and making it whole means more than forcing it to abandon its nonprofit community use and accept what it could obtain in the marketplace from a profit motivated purchaser. Simply stated this method insures that sufficient

---

**30.** Indeed, courts have limited application of this replacement cost standard to cases where replacement by the condemnee, whether public or private, is required by law or by the continuing needs of the community. *See e.g., United States v. Certain Land*, 346 F.2d 690, 695–96 (2 Cir. 1965); *United States v. Certain Property*, 403 F.2d 800, 803–04 (2 Cir. 1968); *United States v. 564.54 Acres of Land*, 506 F.2d 796, 800 (3 Cir. 1974); *United States v. Streets, Alleys & Public Ways*, 531 F.2d 882, 885–86 (8 Cir. 1976).

damages will be awarded to finance a replacement for the condemned facility. Nothing less would afford just compensation. And since the owner of a facility devoted to a non-profit, public use has a proprietary as well as a community interest in it, if the fair market value exceeds the costs of the substitute facility, such an owner should be entitled to the higher of the two measures of compensation. *See also State of California v. United States*, 395 F.2d 261, 264–66 (9 Cir. 1968).

Here the transferors have no desire to be put in a financial position that will enable them to build another railroad; they want to exit from the railroad business, not to enter it. As the Supreme Court said in the *Rail Act Cases, supra*, 419 U.S. at 156, 95 S.Ct. 365,

> Complainants evidence no interest in retaining their property for longer than the Rail Act requires. Indeed, their position is really that they want to be free to dispose of it sooner. Thus, there is no interest asserted in retaining the properties themselves; the only interest is in making sure that creditors receive fair compensation for those properties.

In short, the notion of indemnity which is the root principle of the line of decisions here being reviewed is of no avail to the transferors in this case.

(2) *Use of reproduction cost to value a plant being used for a profitable purpose but unmarketable as such*

■ The transferors rely on the portion of *United States v. Certain Property Located in the Borough of Manhattan*, 306 F.2d 439, 445–49 (Foley Square) (2 Cir. 1962), relating to the newspaper *Il Progresso* as showing that when there is no market for property, reproduction cost may be used. Apart from the fact that the court ruled against the owner, not for him, the argument ignores the point central to the court's discussion. This was that *Il Progresso*, although operating in a 84 year old building and with rather outmoded machinery, was making a profit and wished to continue going on just as it had been. *See id.*, Appendix to Brief of Defendants-Appellants,

at 1114a (District Court decision). Even so, the court sustained a zero award for the building on the basis of evidence that it had no value as a loft building and the absence of evidence that it had any more value as a printing plant. Evidence of reproduction cost of the machinery less depreciation was held to have been properly admitted as one way of getting at the amount required to indemnify *Il Progresso*—by providing the funds it would need to start a similar operation elsewhere, 306 F.2d at 449. Here, as we have just seen, the transferors advance no such theory of indemnity. Unlike *Il Progresso*, they want to discontinue their business, not to continue it at a new site.

(3) *Cases where the market value of property is temporarily distorted or eliminated by governmental action*

Another group of cases said to require a departure from market value as a criterion in this proceeding concerns situations where market value has been adversely affected by governmental activity. The transferors claim that the Government's regulatory actions and its subsidization of other competing forms of transport bring them within the thrust of these decisions. It will be useful first to review the cases and then to consider their applicability.

Some of the cases concern compensation for property whose ordinary use and marketability were affected by wartime governmental regulation. In *United States v. Buxton Lines, Inc.*, 165 F.2d 993 (4 Cir. 1948), the federal government requisitioned a cargo ship with the idea of converting it to a troop transport vessel but returned the ship four months later when the conversion proved impractical. Rejecting the Government's claim that only a nominal amount was owed since the owner would not have been able to sell, charter or otherwise profit from the ship under wartime market conditions, the court ruled that just compensation must be set at "the sum which would probably be arrived at as the result of fair negotiations between an owner willing to sell and a purchaser willing to buy after due consideration of the elements affecting

market value", adding that "[t]he purchaser willing to buy may be merely a hypothetical figure . . . as long as his absence is not attributable to the fact that the property has no value." *Id.* at 996. However, this holding was rested on the special fact that

the [ship] could quite easily have been used during the period in question, the only difficulty being the absence of a private market as a consequence of the war and Government policies.

*Id.* Specifically, the condemnee offered evidence that the Government had prevented it from accepting a foreign company's lucrative offer to purchase the ship. *Id.* at 997. *Buxton* holds little more than that the Government cannot by order destroy a market, with buyers who would have been willing to pay high, perhaps even exorbitant, prices, and then say the property is worth nothing.

*Swiss Federal Railways v. United States,* 112 F.Supp. 357, 125 Ct.Cl. 444 (1953), is a parallel case. The Court of Claims there rejected the Government's contention that just compensation for certain rail tires designed for use on Swiss track was scrap value in light of the absence of any other market at the time of taking in 1943. Although in fact it was the British blockade of shipments to Europe that prevented the tires from leaving New York, the court characterized the issue as if the United States' wartime regulation was responsible for the condemnee's inability to use or dispose of the tires. *See id.* at 361:

Would anyone contend that the Government could take the completed or partially completed works of a fine watch that was ready to be fitted into the case and, on account of wartime conditions, forbid the sale of watches and pay for the watch on the basis of the limited value of the raw material that went into its production? Would anyone dare suggest

that the Government could take a man's house and by forbidding the sale of houses or limiting the sale hold the value to the scrap value of the material that originally went into the house? If this were carried to its ultimate result the Government could requisition the arms and ammunition, the trucks and cars used in wartime, and pay for them on the basis of scrap material. It could make a regulation forbidding the sale of these articles in the general market and limit their sale to the Government itself. No one would even dare suggest that it would satisfy the requirements of the Fifth Amendment to offer to pay for them on the basis of scrap material. Yet that is the ultimate effect of what is being contended for in the instant case.

Considering several factors,[31] the court found a value of $4,000, although it had noted that the ceiling prices set by the Office of Price Administration would yield $8,100.84 on the domestic market and $9,180.95 on the export market and that "[t]his would undoubtedly be the rate of compensation had there been a market for these tires," *id.* at 359. The award, apparently, was the value of the tires to the condemnee for its own use, *see id.* at 361, 362. *See also Wilson Athletic Goods Mfg. Co. v. United States,* 161 F.2d 915 (7 Cir. 1947), rejecting the government's scrap valuation for certain processed aluminum sporting goods and considering instead "all factors existing at the time of the seizure," *id.* at 917, where an order of the War Production Board had "destroyed the ordinary market for aluminum," *id.*, and stating that the property taken "could have been held by plaintiff and later used for the purposes for which it had been fabricated," *id.* at 918; *Illinois Pure Aluminum Co. v. United States,* 67 F.Supp. 955, 107 Ct.Cl. 1 (1946), *cert. denied,* 330 U.S. 834, 67 S.Ct. 965, 91

---

**31.** Specifically, 112 F. Supp. at 362:

the fact that the value of the tires as manufactured articles was far above the price of scrap, the fact that they were purchased for a specific use and not for a speculative purpose, . . . the wartime conditions that existed, the necessity for special allocations

and priorities, the natural and proper restrictions that are placed around the disposition of materials in a period when the world is torn by war, and . . . the various regulations and restrictions and limitations that were placed upon articles of this character and made of this material . . . .

L.Ed. 1281 (1947), where the court also considered "all the facts and evidence," *id.* at 958, in fixing just compensation for aluminum requisitioned after orders of the War Production Board that were said to have "limited the use of aluminum, finally throwing a curtain of steel around its disposition so that its use was practically limited to war purposes," although noting that "we do not think plaintiff can justly claim a value that would have prevailed had no wartime regulations or controls existed or been necessary," *id.* at 956; and *Seven-Up Bottling Co. of Los Angeles, Inc. v. United States*, 68 F.Supp. 735, 107 Ct.Cl. 402 (1946), *cert. denied*, 332 U.S. 757, 68 S.Ct. 56, 92 L.Ed. 343 (1947), where the restrictions the Government placed on the use of waters after Pearl Harbor destroyed the market for yachts, and the court in compensating the owner of the requisitioned vessel took into consideration "the conditions that prevailed and the intrinsic value of the vessel," *id.* at 736, 107 Ct.Cl. 402, including depreciation and the cost of maintenance while the vessel was in lay-up status.

In two other cases, the Government's pre-taking activity affecting market value related peculiarly to the property taken. In the first case, *Turney v. United States*, 115 F.Supp. 457, 126 Ct.Cl. 202 (1953), the court was presented with the task of valuing certain classified radar equipment that had mistakenly fallen into private hands in the Philippines as part of a sale of government surplus. After negotiations for return of the equipment stalled, the Federal Government arranged for an embargo of the property by the Philippine government in contemplation of its repossession. Emphasizing the Federal Government's role in preventing any sale—the owners had commenced negotiations with the Chinese Nationalist Air Force—the court set an award of $75,000, although the Government's procurement cost was $441,889.79 and the Government in selling similar property as surplus sought $36,825 or $7,365.50 (depending on the appropriate classification). *See* 115 F.Supp. at 464–65.

In the second case, *United States v. 220.0 Acres of Land (Assateague Island Condemnation Case)*, 324 F.Supp. 1170 (D.Md.1971), the United States condemned Assateague Island for preservation as a National Seashore. The Government sought valuation based on sales of lots in certain parts of the island in past years while the owners claimed "that prices during those years were depressed by special and unusual circumstances, including actions taken by the State of Maryland at the instance of the Secretary of the Interior." *Id.* at 1172 (footnote omitted). After setting out in detail the activities of the federal and state governments in discouraging the private development of the island, the court ruled that such depressed market values could not be dispositive of just compensation. *See id.* at 1180:

> The principal legal problem in this case is the effect that should be given to the actions of the State of Maryland, which were induced to a considerable extent by the Secretary of the Interior, and were intended to prevent any building on Assateague during the years 1963–1965. . . .

> The Court concludes that in the context of the present case the consequences of those actions should not be ignored or dismissed as "incidents of ownership". It would be unfair to permit the condemning agency to depress property values, directly or indirectly, by interfering with the property owners' rights to use their land, and then take advantage of such depression to reduce the price which it must pay for the property.

In sum, the cases hold that the Government may not manipulate a market to depress prices and then benefit from the reduction.

In an effort to bring themselves within these cases, the transferors have mounted an extensive presentation to show that public policies toward the railroads have had such a depressing effect as to entitle them to a valuation on the basis of a market somehow reconstructed so as to be free from these adverse effects or on some other basis that would more properly reflect the "intrinsic" value of their properties. A particularly impressive showing with respect to

such public policies was made in the opening brief of Intervening Penn Central Lienholders. Citing a long list of governmental publications,[32] this analysis divided the detrimental public policies into two general categories:

First,

> Public (federal, state and local) financial subsidies to the intermodal competition of the railroads which decisively favored rival modes and hurt the railroads at precisely the time that such a competitive disadvantage was most likely to jeopardize the survival of the railroad. . . .

And second,

> A regime of regulatory and political constraints governing the railroads that stifled efforts to respond to larger economic forces impacting the railroads and to the specific challenges of less regulated intermodal competition; all evidenced by artificial and destructive policies on such subjects as rates, divisions, technological and service innovations, labor relations, service and branch line curtailment, to name just a few.

(Brief at 96–97).

In support of the former, the brief quotes from the Preliminary System Plan

> The early assistance to railroads pales when compared to the continuing aid given to the development of the private automobile and trucking industry, the airlines and inland barge operations—all competitors to the railroads.

> Through 1973, total federal, state, and local expenditures to support rival forms of transportation have been in excess of $450 billion, most of it spent since 1920.

PSP, Vol. I, at 4.

Federal, state and local government expenditures for highways between 1951 and 1973 amounted to almost $305 billion and for waterways to almost $14 billion. At the same time the railroads were able to invest only about $37.5 billion, all internally generated or privately raised. Moreover, whereas the highways and waterways are free from state and local taxes, these consumed more than half of the pre-federal income tax net railway operating income of the Class I railroads for many years until by 1970 they exceeded such income. The railroads were burdened with the capital costs of providing and maintaining their rights of way whereas their motor and water competitors were not. The railroads were also burdened by regulation, particularly by use of the minimum rate power to prevent their competing more effectively with motor and water carriers. The PSP, Vol. I at 4, cited a recent study which estimated the enormous loss from excess capacity and misallocation of resources attributable to regulatory inadequacies as ranging from $4 to $9 billion annually. *See also* Friedlaender, *The Social Costs of Regulating the Railroads*, 61 *Papers and Proceedings of the American Economic Assoc.* 226, 234 (1971) (estimating $2.4–3.8 billion loss in 1969). The brief lists various defects and inadequacies in rate regulation, prohibition of diversification into other modes of transportation, failure to increase the divisions of the railroads in the northeastern region, refusals to allow the railroads to terminate light density lines and losing passenger service, and what is claimed to be unduly favorable treatment of job protection for railroad labor, as instanced, for example, by Senate Joint Resolution 59 of February 9, 1973, Pub. L. 93–5, 87 Stat. 5, noted in our CUE opinion, 439 F.Supp. at 1360, which

---

**32.** Staff of the Senate Comm. on Commerce, 92d Cong., 2d Sess., The American Railroads: Posture, Problems and Prospects (Comm. Print 1972); Staff of Senate Comm. on Commerce, 92d Cong., 2d Sess., The Penn Central and Other Railroads (Comm. Print 1972); U.S. Dept. of Transportation, Northeastern Railroad Problem (1973); USRA, Final System Plan (1975); USRA, Preliminary System Plan (1975); U.S. Department of Transportation, Rail Service in the Midwest and Northeast Region (1974); Rail Services Planning Office of I.C.C., Evaluation of the U.S. Railway Association's Preliminary System Plan (1975); I.C.C., Means for Preserving and Maintaining Essential Rail Services, Report Pursuant to S.J. Res. 59 (1973); Task Force on Railroad Productivity of The National Commission on Productivity and The Council of Economic Advisers, Improving Railroad Productivity (1973).

thwarted the efforts of the PC Trustees to reduce the size of train crew consists.[33]

While answers can doubtless be made to some of this barrage of charges, we have little doubt that the governmental policies and actions we have here summarized and others we have omitted in the interest of brevity have contributed greatly to the plight of the northeastern railroads. Not denying this, the Government parties assert that such matters may not be taken into account in fixing "just compensation" unless the governments' acts were unconstitutional, which the transferors other than Reading, see fn. 35 *infra*, have not claimed.

The decisions discussed up to this point do not support the broad conclusion the transferors would have us draw from them. *Buxton Lines, Swiss Federal Railways, Wilson Athletic Goods, Illinois Pure Aluminum,* and *Seven-Up Bottling* were concerned with distortion of market conditions related to wartime governmental needs or exigencies, not to governmental activity serving more traditional regulatory or promotional purposes. The courts have deemed it somewhat unfair to ignore market values that will be shortly attainable—and indeed would have been attainable during the war if the Government had not prevented their realization.[34] Furthermore, when an industry has not been directly regulated but is affected incidentally by temporary regula-

tion designed towards another end, the investors may well not have taken the prospect of government action into account. In contrast when an industry has long been the subject of direct and permanent regulation, governmental action is taken into account by those investing in it. Regulation has been a fact of life in the railroad industry for a century, and government assistance in the building of roads, canals—and later the railroads themselves—goes back to the early days of the Republic. If a state chose to condemn a toll road, the owners of the latter could not successfully claim that it must be valued on a basis that would ignore the competition from free roads the state had built. *Turney* and *Assateague Island* are even further removed from this case as in both the inadequacy of the market was caused by the taker's actions which had the direct effect of reducing the market value of the specific property that was shortly to be taken.

A decision closer to supporting the transferors' position is that of a badly split New York Court of Appeals in *In re Fifth Ave. Coach Lines, Inc.,* 18 N.Y.2d 212, 273 N.Y. S.2d 52, 219 N.E.2d 410 (1966), *appeal dismissed,* 386 U.S. 778, 87 S.Ct. 1480, 18 L.Ed.2d 524 (1967). The majority of four there held that a condemnation award of "going concern" value to a formerly profitable bus line which had lost its earning

---

**33.** For a thorough review of Federal regulatory and tax policies regarding the railroads and other forms of transportation, see Study of Federal Aid to Rail Transportation: Report of the Secretary of Transportation to the United States Congress Pursuant to Section 902 of the Railroad Revitalization and Regulatory Reform Act of 1976 (1977), especially chapters III, IV and V.

**34.** These cases may thus be thought to be akin to those that would disregard fluctuations owing to periods of depression or boom markets—a situation where the decisions are said to go both ways. *See 4 Nichols, supra* § 12.-3112; 1 *Orgel* §§ 24–25. *See also United States v. Cors,* 337 U.S. 325, 333–34, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949), indicating that an increase even in private market price attributable to the Government's wartime needs is not compensable. It should also be noted that the Supreme Court in *United States v. Commodities Trading Corp.,* 339 U.S. 121, 125–29, 70 S.Ct. 547, 94

L.Ed. 707 (1950), disapproved compensation for so-called "retention value"—the value of the right to hold on to property until a value-reducing governmental regulatory scheme (in that case, Office of Price Administration ceiling prices on pepper) came to an end and then to dispose of it—a result that would call into question the result in the cases here under discussion to the extent that they reflect the notion that the property should be valued at greater than a depressed market value because of such a "retention value." *See Swiss Federal Rys., supra,* 112 F.Supp. at 360 (attempting to distinguish *Commodities Trading Corp.*); 4 *Nichols, supra* § 12.3111, at 12–131 n. 6 (suggesting that *Swiss Federal Rys.* "implicitly recognized" the "retention value" rejected by *Commodities Trading Corp.*). *See also United States v. Felin & Co.,* 334 U.S. 624, 68 S.Ct. 1238, 92 L.Ed. 1614 (1948) (upholding award based on OPA ceiling prices for commodities).

capacity was required when the loss of earning capacity was not due to "the economic law of diminishing returns or inefficient management" but occurred because New York City, which was both the condemnor and the ratemaking authority, had denied "for political reasons, the right to charge an increased and reasonable fare" that would have yielded "large gains in gross revenues and greater gains in net profits as going concerns at the time of condemnation." *Id.* 18 N.Y.2d at 220–21, 273 N.Y.S.2d at 56, 219 N.E.2d at 413.

 We basically disagree with the *Fifth Avenue Coach* majority. Railroads, like other forms of business, take their chances on what government may do in the way of regulating them or helping their competitors. So long as government has not acted beyond its constitutional powers, a condemnee is not entitled to the recognition of values that have been impaired by a long and established course of government action.[35] Two judges joined Judge Keating in a dissent saying that:

> Political considerations, in this case the pocketbook of the millions of New Yorkers who use the transit system daily, are not to be shrugged off lightly. This was a fact of life with which the claimants were required to contend throughout their operating existence. The announce-

ment of condemnation did not herald an end to their burden—at least it should not with regard to valuation. . . .

Moreover, even if we agreed with the majority in *Fifth Avenue Coach*, it would not bridge the gap between the cases discussed at the beginning of this section and the result that the transferors wish us to reach. Whereas in *Fifth Avenue Coach* a court could quantify the result of rate increases that had been sought and denied, no one could possibly determine what the bankrupt railroads would have earned if government had not taken, or had taken less of, the various promotional and regulatory steps of which the transferors complain.

### (4) *The patent cases*

The line of decisions most helpful to the transferors' contention that value to the taker must be considered in some circumstances are cases, arising under 28 U.S.C. § 1498(a), where the Government has infringed a patent having no or little commercial use and the Court of Claims has considered the value to the Government—in some instances hypothesizing a bargaining process such as we have described above. The principal cases relied on by the transferors are *Olsson v. United States*, 25

---

**35.** We expressly reject the claim of the Trustee of the Reading that "regulatory strangulation" and particularly approval of the Penn Central merger constituted a taking. In regard to the merger, as pointed out in our CUE opinion, 439 F.Supp. at 1383, and in *Erie-Lackawanna R.R. v. United States*, 279 F.Supp. 316, 330–32 (S.D. N.Y.1967), *modified and aff'd, Penn Central Merger and N & W Inclusion Cases*, 389 U.S. 486, 519–20, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968), Reading had ample opportunities to protect itself both in the B & O—C & O and in the Penn Central merger proceedings but neglected to avail itself of them until too late. *See also* Brief of Reading Co. at 56–57. The Reading also offered no timely challenges to the other regulations it now assails as unconstitutional. The argument that *United States v. Dickinson*, 331 U.S. 745, 749, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), entitled the Reading to delay bringing suit for 70 years after it claims the "regulatory strangulation" began, and nine years after consummation of the Penn Central merger stretches that case beyond reason. In

*Dickinson*, the Court held that since the rising of the water level after construction of a dam was continuous, the statute of limitations did not begin to run until a final account of the damages could be struck. In *Klein v. United States*, 152 Ct.Cl. 221, *cert. denied*, 366 U.S. 936, 81 S.Ct. 1661, 6 L.Ed.2d 847 (1961), where there were regular airplane flights over plaintiffs' property and in *Gregory v. City of New York*, 346 F.Supp. 140 (D.C.1972), where the plaintiff alleged a continuing trespass because of the city's diversion of a river in which he had riparian rights, the courts followed *Dickinson*. Here, by contrast, the regulatory actions described by Reading were a series of discrete events offering numerous opportunities for objection.

Even if Reading's claim of a regulatory taking were valid, it would not alter the standard to be applied in the determination of CMV, but would give rise to a claim for compensation independent of the one pressed in this Court, a claim for which we would not have the power to order relief.

F.Supp. 495, 87 Ct.Cl. 642 (1938), *cert. denied*, 307 U.S. 621, 59 S.Ct. 792, 83 L.Ed. 1500 (1939); *Marconi Wireless Telegraph Co. v. United States*, 99 Ct.Cl. 1 (1942), *rev'd in part on other grounds*, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943); *Badowski v. United States*, 278 F.2d 934, 150 Ct.Cl. 482 (1960); *Saulnier v. United States*, 314 F.2d 950, 161 Ct.Cl. 223 (1963); *Ushakoff v. United States*, 375 F.2d 822, 179 Ct.Cl. 780 (1967); *Amerace Esna Corp. v. United States*, 462 F.2d 1377, 199 Ct.Cl. 175 (1972); and *Tektronix, Inc. v. United States*, 552 F.2d 343 (1977).

The most recent case, *Tektronix*, applied a willing buyer-willing seller approach to an instance where the patent had commercial value, but where the court deemed there was no established royalty rate. *Olsson*, the case most helpful to the transferors, applied a similar approach to a patent on howitzer recoil mechanisms which had no commercial value, and used cost-savings to the Government as a basis for determining a reasonable royalty. In *Ushakoff*, where the patent on solar-powered water stills again had no commercial value, the court set a rate of slightly under 5 percent, apparently based on customary commercial standards. In *Badowski*, there was a limited commercial market for the patented parachute release device; the willing buyer-willing seller approach was used by taking the prior commercial license rate as a benchmark, and then reducing the royalty somewhat because of the greater volume purchased by the Government. In *Saulnier*, the patented airplane canopy had no established commercial royalty rate and the court used the patent owner's settlement of an earlier claim against the British Government as a guide. In *Marconi Wireless*, there was no assertion that the patented radio circuitry had value only in Governmental uses; the case applies a percentage-of-cost-savings approach to establish reasonable compensation—apparently because the finished radios sold by an infringer to the Government embodied several different patents and it was thus difficult to determine a gross sales figure to which a royalty should be applied. In *Amerace Esna*, there

were no industrial licensing agreements to serve as a standard for the patented process of removing rust from ballast tanks, but it does not seem very plausible that the invention was without any commercial application. The court rejected a cost-savings approach as lacking factual support and instead resorted again to the fiction of a willing buyer and willing seller agreeing on the apparently common 5 per cent royalty.

Apart from the facts that the Court of Claims' application of the willing buyer-willing seller approach to the Government in these cases has never been passed upon by the Supreme Court and that the benefits realized by the patentees from that approach have been rather modest, we do not believe the cases support the broad conclusions the transferors would have us draw from them. They are distinguishable on several grounds. One lies in the origins of 28 U.S.C. § 1498(a), under which these cases were decided.

28 U.S.C. § 1498(a) provides in pertinent part:

Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the Court of Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

The statute is derived from the Act of June 25, 1910, c. 423, 36 Stat. 851, as amended by the Act of July 1, 1918, c. 114, 40 Stat. 705. The 1910 statute provided in pertinent part:

That whenever an invention described in and covered by a patent of the United States shall hereafter be used by the United States without license of the owner thereof or lawful right to use the same, such owner may recover reasonable compensation for such use by suit in the Court of Claims. . . .

The 1918 amendment changed the standard of compensation from "reasonable compensation" to "reasonable and entire compensation," and made recovery available not only when the United States had "used" an invention covered by a patent, but whenever the invention had been "used *or manufactured* by *or for* the United States.[36]

Before 1910, the protections afforded a patentee against the Government's use of his patent were strangely limited, even though it was clear that governmental use was one of the exclusive proprietary rights belonging to the patentee, *see Schillinger v. United States*, 24 Ct.Cl. 278, 296 (1889), aff'd, 155 U.S. 163, 15 S.Ct. 85, 39 L.Ed. 108 (1894); *William Cramp & Sons Ship Building Co. v. International Curtis Marine Turbine Co.*, 246 U.S. 28, 39–40, 38 S.Ct. 271, 62 L.Ed. 560 (1918). If a governmental officer acting within the scope of his authority and acknowledging the validity of the patent made use of the patent *with the owner's permission*, either express or implied, the United States was considered liable to a contract action in the Court of Claims for reasonable compensation.[37] *See e.g., William Cramp & Sons Ship Building, supra,* 246 U.S. at 40, 38 S.Ct. 271. *See also United States v. Société Anonyme Des Anciens Etablissements Cail*, 224 U.S. 309, 32 S.Ct. 479, 56 L.Ed. 778 (1912); *McKeever v. United States*, 14 Ct.Cl. 396, 422–24 (1878), aff'd

18 Ct.Cl. 757 (Sup.Ct.1882); *Schillinger v. United States, supra,* 24 Ct.Cl. at 298. Such an action could be brought even though the amount of compensation had not been agreed upon, so long as the parties' mutual consent to the use of the patent could be implied, *see United States v. Berdan Fire-Arms Manufacturing Co.*, 156 U.S. 552; 569, 15 S.Ct. 420, 39 L.Ed. 530 (1895). However, where the Government officer did not have prior knowledge of or disputed the patent right or where the owner had not manifested consent, the existence of a contract could not be implied and the only redress of the patentee was an action in tort against the individual official. *See William Cramp & Sons Ship Building, supra,* 246 U.S. at 40–41, 38 S.Ct. 271. *See also Crozier v. Fried. Krupp Aktiengesellschaft*, 224 U.S. 290, 302–04, 32 S.Ct. 488, 56 L.Ed. 771 (1912); *Interdent Corp. v. United States*, 488 F.2d 1011, 1013, 203 Ct.Cl. 296 (1973).

The objective of the 1910 statute thus was to place the patentee who had not consented, either because the Government had not sought his consent or because it had been impossible to reach an agreement, on the same footing as the patentee who could spell out some form of consent and sue on an implied contract. In working out what the terms of such an implied contract would have been in situations where no other standards were available, the Court of Claims would necessarily have had to consider what agreement the patentee and the Government would have reached. It is thus not surprising that, despite the many references by the Court of Claims and some by the Supreme Court to § 1498 and its predecessor as being an eminent domain statute,[38] the purpose of the 1910 statute to

---

**36.** In 1960, a section covering copyrights and paralleling old § 1498's provisions for patents was added as § 1498(b), *see* Act of September 8, 1960, Pub. L. 86–726, §§ 1, 4, 74 Stat. 855, 856.

**37.** The first act providing jurisdiction in the Court of Claims for claims founded upon "any contract, express or implied, with the government of the United States" was the Act of February 24, 1855, c. 122, 10 Stat. 612; that provision was later incorporated into the Tucker Act, Act of March 3, 1887, c. 359, 24 Stat.

505, now codified as 28 U.S.C. § 1491. *See Hart & Wechsler, The Federal Courts and the Federal System* 1326–27 (2d ed. 1973).

**38.** *See, e.g., Crozier v. Fried. Krupp, supra,* 224 U.S. at 304–05, 32 S.Ct. 488; *William Cramp & Sons Shipbuilding Co. v. International Curtis Marine Turbine, supra,* 246 U.S. at 42, 38 S.Ct. 271; *Irving Air Chute Co. v. United States*, 93 F.Supp. 633, 635, 117 Ct.Cl. 799 (1950); *Interdent Corp. v. United States, supra,* 488 F.2d at 1013; *Tektronix, Inc. v. United States, supra,* 552 F.2d at 346–47.

equate the non-consensual with the consensual transaction has properly, if perhaps not always consciously, entered into the manner in which just compensation is determined.

A further basis of distinction—perhaps only a different way of stating the same one—is this. In the cases relied upon by the transferors, the Government was not taking the patent but rather a non-exclusive license for governmental use. As noted in a somewhat different context, *Schillinger v. United States, supra,* 24 Ct.Cl. at 298–99,

> There may be a distinction between the taking of intangible property, such as a patent right, and the taking of tangible property in this, that by the Government's use of a patent right the owner loses nothing *per se* through the taking; whereas if a tangible article be appropriated the owner instantly becomes so much the poorer. . . . [T]he use of a patented process or article may directly deprive the owner of nothing of intrinsic value, but be simply an invasion of a right. . . .

The value of which the patentee is deprived by the Government's taking a nonexclusive license is the value he might have obtained by *selling* a license or the finished patented product to the Government itself. This is true of *every* case where the Government infringes a patent, even where the patent has significant commercial value, so long as the governmental use of the patented invention does not diminish the market demand for the patent for nongovernmental uses. It should therefore be no surprise that in the instances where there happens to be no or little nongovernmental use, the Court of Claims should have sought to construct a market. Yet even in such cases the

Court of Claims does not generally apply a value to the taker concept in the sense of giving significant weight to the Government's necessities. The Court of Claims has not used governmental cost-savings as even a basis of calculation under § 1498 since the *Marconi* case in 1943, *see Amerace Esna, supra,* 462 F.2d at 1379–80 & n. 4, and *Tektronix v. United States, supra,* 552 F.2d at 347–48 & n. 5, and has rejected cost-savings calculations when they resulted in royalties which were unusually high by commercial standards, *see Ushakoff v. United States, supra,* 375 F.2d at 825.

■ Finally, while we find little merit in the broad contention of the Government parties that the results of the cited cases were dictated by the very existence of a patent system which is designed to encourage inventors by offering them suitable rewards, a narrower form of the argument has validity. This is that since adoption of the predecessor of 28 U.S.C. § 1498(a) in 1910, the Government has held out the promise to inventors that if it used their inventions without their consent, it would pay suitable compensation. Many inventors may have proceeded in reliance on this representation. To read the statute as denying compensation in cases where the invention was of no or little use save for governmental purposes would indeed keep the word of promise to the ear but break it to the hope. Congress held out no similar invitation in the Rail Act—a statute designed to preserve a failing transportation system from completely disappearing, at the minimum cost to the taxpayers permitted by the just compensation clause, and there is no suggestion that any transferor has constructed its railroad in the expectation that the Government would take it over.[39]

Although the Court of Claims has stated that § 1498 is "unrelated to contract doctrine," *Interdent Corp. v. United States, supra,* 488 F.2d at 1013, the court was merely holding that amendment of § 1491 to extend the court's jurisdiction to contracts and implied contracts of military exchanges did not authorize the court similarly to extend § 1498. The holding that § 1498 is not meant to govern contractual relationships is entirely consistent with the views we have expressed above.

39. *Armstrong v. United States,* 287 F.2d 577, 152 Ct.Cl. 731 (1961), is somewhat similar to the patent cases. There, the Government had terminated a contract for construction of 11 boats and acquired possession of them and construction materials before 10 of the boats were complete. The plaintiffs had a materialmen's lien on this property, and the Supreme Court held that there had been a taking of their property interests for which compensation was required. *Armstrong v. United States,* 364 U.S.

(5) *Condemnation of unprofitable public utilities for continued use*

The transferors cite a number of cases where the condemnor of unprofitable public utilities for continued use as such was required to pay more than liquidation value which in those instances seems to have been a sale as scrap. If we leave for further discussion the decision of the New York Court of Appeals in *In re Port Authority Trans-Hudson Corp. (PATH)*, 20 N.Y.2d 457, 285 N.Y.S.2d 24, 231 N.E.2d 734 (1967), cert. denied, 390 U.S. 1002, 88 S.Ct. 1244, 20 L.Ed.2d 103 (1968), five of the cases awarded original cost (OC), original cost less depreciation (OCLD) or an amount between OCLD and scrap value; four awarded reproduction cost new less depreciation (RCNLD). The cases which give some or controlling weight to OC or OCLD are *In re Fair Oaks Irrigation District*, [1918C] P.U.R. 879 (Cal. Railroad Comm'n 1918); *In re City of Eureka*, 19 Cal. R.C.D. 952 (1921); *In re City of Oroville*, [1922E] P.U.R. 451 (Cal. Railroad Comm'n 1922); *In re Aldercroft Heights County Water District*, 60 P.U.R.3d 227 (Cal.Public Utils.Comm'n 1965); and *In re City of Washburn*, [1924D] P.U.R. 368 (Wis. Railroad Comm'n 1924). The cases giving controlling weight to

RCNLD are *Appleton Waterworks Co. v. Railroad Comm'n of Wisconsin*, 154 Wis. 121, 142 N.W. 476 (1913); *Lanneau v. Capital Transportation Corp.*, 292 So.2d 810 (La. App. 1974); *In re Ottawa and Gloucester Road Co. and County of Carleton*, 69 D.L.R. 486 (Ontario Sup. Ct.App.Div. 1921); and *International Railway Co. v. Niagara Parks Comm'n*, [1937] 3 D.L.R. 305 (Privy Council).

We can pretermit discussion of the cases giving weight to OC or OCLD since this subject will arise in our discussion of *PATH*. The RCNLD cases are distinguishable on their facts. In the *Appleton Waterworks* case, one of only two rendered by courts in the United States, it is not clear that the utility was incapable of profitable operation; the condemnation by the city seems to have been caused by the utility's inability to improve the service rather than by the impossibility of going on.[40] In *Lanneau*, the other case decided by a United States court, the city's own appraiser had used a RCNLD approach and the court endorsed his valuation, rejecting the plea of the losing utility for the addition of "going concern" value.[41] The *Ottawa and Gloucester Road Company* decision may have been affected by the existence of other "public

40, 80 S.Ct. 563, 4 L.Ed.2d 1554 (1960). On remand in the Court of Claims, the Government claimed that its prior lien for progress payments exceeded the value of the ships, so that the plaintiffs' lien was valueless.

The Court found that the ships had little or no market value because of their specialized construction and because "there was probably not a great market for unfinished boats any more than there would be a general market for a suit of clothes with just one leg of the trousers finished, even though the remaining material were furnished with the partially finished suit of clothes." *Id.* 287 F.2d at 580, 152 Ct.Cl. at 737. In determining the value of the plaintiffs' materialmen's lien, the Court therefore sought to determine the "actual and intrinsic value of the ships," considering the amount the Navy had contracted to pay for them, and the amount the shipbuilder had expended.

The case is not analogous to this one. The ships were built at the request of the Government and were only useful for the Government's purposes.

**40.** Upon application of the city, the railroad commission in May 1910 ordered the utility to

make improvements in its plant before rate increases would be granted. Three months later, the city called an election to determine whether it should purchase the plant.

Although the utility was in receivership and a mortgage on its property had been foreclosed, there was evidence that expenditure of "at least $50,000" would render the plant "reasonably efficient," 154 Wis. at 149, 142 N.W. at 485, and no indication that there was any difficulty in meeting operating expenses. Indeed, the court's statement that in valuing the enterprise, it could not add together the value of specific items but had to determine "as accurately as possible the revenue producing power of the entirety on the basis of reasonable charges for service to customers," 154 Wis. at 144, 142 N.W. at 483, indicates that the court itself did not consider the utility to be truly unprofitable.

**41.** The court also noted that although the parties "to some extent" treated the litigation as an "expropriation proceeding," it was in fact merely a suit on a contract. 292 So.2d at 816.

bodies which might have taken over the roads, if the county had not done so," 69 D.L.R. at 489–90 (opinion of the trial court). In the *International Railways* case the Privy Council was construing an agreement that at the end of the franchise the railway should be "duly compensated for their railways, equipment, machinery and other works. . . . " 3 D.L.R. at 308. The Judicial Committee was influenced by the point that "[T]he meaning of the agreement must be the same whether the railway proved a success or a failure" and that since in the former event the Park Commission would not have been required to compensate for loss of future profits, it would be unfair to allow the Commission to pay only "break-up value" when the operation had become a losing one. *Id.* at 315. Moreover, the RCNLD decisions are rather dated and came from a period when reproduction cost enjoyed a greater favor than it now does (see the discussion below), and none explicitly considered the just compensation clause of the Fifth Amendment.

Despite this, the Government parties have not met the challenge of the transfer-

ors to produce a single decision in which a losing public utility being taken for continued use was valued as scrap [42] and the opinions convey a sense that such a solution would be unacceptable, at least if scrap value were negligible.[43] That is the rationale—the Government parties say lack of rationale—of Judge Keating's opinion for the New York Court of Appeals in *PATH.*

Of all the cases brought to our attention, *PATH* provides the strongest support for deviating from the market value rule. That case was concerned, among other matters, with the condemnation of four single track railway tunnels under the Hudson River and subterranean tunnels connecting them with passenger terminals in New York and New Jersey. The operation was a hopelessly losing one. The trial court awarded $30,000,000, "predicated on the conclusion that the condemnees should at least be repaid for the depreciated original cost of the tunnels," 20 N.Y.2d at 471, 285 N.Y.S.2d at 32, 231 N.E.2d at 740, as against a figure of $400,000,000 for reproduction cost and a zero liquidation value as scrap. The Appellate Division reduced the

---

**42.** The *New Haven Inclusion Cases, supra,* 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691, do not qualify for this role, as the Government parties urge. The *New Haven* was not a condemnation case, and the Court held only that an agreement between the New Haven reorganization trustees and Penn Central to sell the New Haven's assets on the basis of their liquidation value was, under the circumstances, "fair and equitable" within § 5(2) of the Interstate Commerce Act. The Court rejected the New Haven bondholders' claim to superimpose "going concern" value on liquidation value. *Id.* at 481–82, 90 S.Ct. 2054. No one had argued, however, that the entire valuation should have been on a different basis, such as OCLD or RCNLD.

*Market Street Railway Co. v. Railroad Comm'n of California,* 324 U.S. 548, 564–68, 65 S.Ct. 770, 89 L.Ed. 1171 (1945), comes closer to meeting the transferors' challenge. The Court there held it was not a denial of due process for a state to fix rates for a hopelessly losing street railway that would produce a fair return on the price of $7,950,000 at which the properties had been offered to the City of San Francisco, as against much higher figures of reproduction cost, book value and outstanding securities issued with the approval of the regulatory commission. Mr. Justice Jackson said, 324 U.S. at 567, 65 S.Ct. at 780:

The owners of a property dedicated to the public service cannot be said to suffer injury if a rate is fixed for an experimental period, which probably will produce a fair return on the present fair value of their property. If it has lost all value except salvage, they suffer no loss if they earn a return on salvage value. If the property has no prospect of salvage except through dismantling and sale for scrap, the scrap value for such of it as is to be scrapped may represent its present worth. The record in the *Market Street* case does not disclose what the scrap value would have been. The transferors also urge that the quoted remarks were dicta as the Court had found that the rates that were upheld produced "all that the company could earn," 324 U.S. at 566, 65 S.Ct. at 779, since any higher rates would have driven traffic away.

**43.** The attitude embodied in these cases is encapsulated by Justice Latchford's remark in the *Ottawa and Gloucester Road Co.* case; noting the possibility that the owners should have been paid nothing because the properties had neither positive earning capacity nor scrap value, he said, "I am glad that no such view was taken . . . ." 69 D.L.R. at 494.

award to "virtually nothing." The Court of Appeals restored the award of the trial court, saying:

> Can it be said by any objective standard that an award of scrap value—*nothing*—is fair and just for the tunnel property, an essential part of an essential public facility, which cost some $32,000,000 to construct, which would cost in excess of $400,000,000 to reproduce and which, with some minor expenditures will function as good as new for an indefinite period? We think not. . . .

20 N.Y.2d at 470, 285 N.Y.S.2d at 32, 231 N.E.2d at 739.[44] While *PATH* is not binding upon us,[45] this decision demands serious attention.

Both the majority and the minority in *PATH* sought to draw comfort from Mr. Justice Cardozo's opinion in *Roberts v. New York City*, 295 U.S. 264, 55 S.Ct. 689, 79 L.Ed. 1429 (1935). That decision is not easy to understand. The case concerned the valuation of a losing spur of an elevated railroad; the New York Court of Appeals had allowed the scrap value of the spur and the original cost to the railroad in acquiring easements of light, air and access. The railroad's receiver and others allied in interest with him obtained certiorari; the City acquiesced in the decision of the New York Court of Appeals. The subject principally discussed in the Supreme Court's opinion was the adequacy of the award for the easements which if they had to be acquired at the date of condemnation would have cost $3,600,000 as against the original cost of $539,117.41 that had been awarded. The Court held, 295 U.S. at 282, 55 S.Ct. at 693, that "the award is not too low, though perhaps it is too high." It pointed out that the easements were useful only in connection with operation of the spur and said, in the words stressed by the dissenting judge in *PATH* and by the Government parties here, that

> the record indicates that, despite rising costs of labor and equipment, the original cost of the non-tunnel property exceeded the depreciated reproduction cost of that property and the award made by Special Term was only some $3,000,000 less than the depreciated reproduction cost. By comparison, the award for the tunnel property, which gave effect to the unprofitability factor, was less than one fifteenth the depreciated reproduction cost. It is thus clear that Special Term not only failed to give effect to the physical and technological obsolescence of the property but that it also apparently ignored the enormous expenditure which was required to rehabilitate the property and did not give any significant effect to the unprofitability factor. *Id.*

**44.** The Court also said:

> We are here concerned with a property which has a usefulness created by the owner himself through the expenditure of large sums of money and by the continued operation of the property for the very purpose for which the petitioner is acquiring the property. It is the owner who built the "reservoir" —the Tube railway system in the present case. This owner has developed its property at a cost of millions of dollars and operated it for more than 50 years. It is admittedly of great usefulness in the daily transportation of thousands of commuters. A condemnor should not be permitted to tell him: "It's only worth scrap or less".

20 N.Y.2d at 468, 285 N.Y.S.2d at 30, 231 N.E.2d at 738.

The *PATH* case also involved non-tunnel properties. As to these, while the Court of Appeals disapproved the Appellate Divisions's award of scrap value "solely on the basis of unprofitability of the enterprise," 20 N.Y.2d at 471, 285 N.Y.S.2d at 32, 231 N.E.2d at 740, it also disapproved the trial court's award of $20 million "on the basis of original cost less an amount for depreciation which had no support in the record" on the ground "that much of the non-tunnel property was severely deteriorated, and that an expenditure of almost $32,000,000 would be necessary to rehabilitate the non-tunnel property whereas only $88,000 was all that would be required to restore the tunnels." 20 N.Y.2d at 471, 285 N.Y.S.2d at 33, 231 N.E.2d at 740. The court added that

**45.** We do not agree with the contention of some transferors that *PATH* was "approved" by the Supreme Court in *The New Haven Inclusion Cases, supra*, 399 U.S. at 482–83, n. 80, 90 S.Ct. 2054, 26 L.Ed.2d 691. The Court summarized the holdings of the *Fifth Avenue Coach* and *PATH* cases and said that in neither did the New York Court of Appeals "require the taking authorities to pay *both* an operating and a liquidating value" but rather had "awarded the owners the value reflecting the highest and best use for their properties . . . ." It would go too far to read into the latter remark a requirement that the principle adopted in *PATH* must be applied in federal condemnation.

Substantial prices are not paid for the privilege of conducting a business at a loss.

*Id.* The Court also sustained the award of only $235 for the scrap value of the spur, *id.* at 284, 55 S.Ct. at 694 saying:

The structure was appraised as junk, the city having undertaken to bear the cost of removal. *Such an appraisal might be too low were it not for the award for the private easements.* To realize the value of those easements, an abandonment of the spur was necessary. "The railroads could not release their rights to the abutting owners and continue to operate their railroads in the street." [In re East 42nd St. Elevated R.R. Structures,] 265 N.Y. [170] at p. 181 [192 N.E. 188]. The structure in the circumstances had no value except as scrap. (Emphasis supplied.)

The *PATH* majority, and here the transferors, stress the italicized sentence, which could mean that when the condemnation is of a railway not possessing easements of light, air and access, scrap value would not be enough even when there is no continued use. Against this are the final sentence and the previous discussion. We thus derive little help from *Roberts.*

## B. Applicability of the Market Value Rule to this Proceeding

While the cases previously reviewed do not carry the weight the transferors would

give them, we cannot be wholly insensitive to the views that seem to underlie them. The courts rejected market value as the measure of just compensation in circumstances which made that measure suspect.

Circumstances peculiar to this case make market value particularly hard to prove. The transferors face serious difficulties in proving alternative scenario sales and. the amounts that would have been obtained from those sales. These difficulties are increased by the chilling effect, not disputed by the Government, that serious discussion of the Rail Act had on the prospect of such sales. The discussion and enactment of the Act eliminated any incentive other parties might have had to negotiate purchases.

This does not mean that we should reject the role of market value in determining just compensation. Nor, however, should we bind a notion as fundamental as just compensation by the sterile logic of provable market value if a manifestly unfair result is produced. We may have such a situation here. It seems incredible that these 19,000 miles of railway and freight and passenger terminals, together with the equity in rolling stock, were worth only $685 million, the sum arrived at in the revised MLP of March 1, 1976.[46] It is nearly as unbelievable as the zero award in *PATH.* Of course, the revision of MLP now in progress or attacks on it by the transferors may considerably augment this figure.[47] It may also be that the transferors will succeed in showing a higher

---

**46.** Although we have refused to consider value to the taker as a measure of the transferors' compensation, we do take note, as urged by counsel for the PC Trustees, of the spread between the approximately $86 million value placed by MLP on the existing Northeast corridor properties and the $1.6 billion appropriated in Title VII of the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. §§ 853, 854, to improve passenger travel time between New York and Boston by 16 minutes, and between New York and Washington by 24 minutes. *See* Study of Federal Aid to Rail Transportation, *supra* at VII–14. A spread of this magnitude provides occasion to recall the Supreme Court's frequent iterations that the "word 'just' in the Fifth Amendment evokes ideas of 'fairness' and 'equity' . . . ." *United States v. Commodities Trading Corp., supra,* 339 U.S. at 124, 70 S.Ct. at 549. *Accord,*

*United States v. Virginia Electric & Power Co.,* 365 U.S. 624, 631, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961); *United States v. Fuller,* 409 U.S. 488, 490, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973).

**47.** An affidavit of J. Richard Tomlinson, Executive Vice-President of the PC, attached to the opening brief of the PC Trustees indicates that the $685 million figure reflected a large number of zero and negative values. Mr. Tomlinson roughly estimated that some $434 million of negative value had been deducted from the transferors' facilities other than "trackwork." Bridges and terminals are typical of such facilities. While we do not now take a position on the issue, we place the Government parties on notice that substantial proof will be required to convince us of the propriety of deductions for "negative value."

value by proving the potential salability of some of the property for rail use. The Government parties might be well advised not to be overly finical in their attitude toward such proof.

It suffices now to note that if the transferors should not be able to establish a figure for NLV which would square with our notions of what constitutes "just compensation," we may be obliged to consider some other method to arrive at CMV. This would not be to deny the thesis of the Government that value to the taker should not be considered. However, if the unique circumstances of this case make it impossible to establish a market value which constitutes just compensation, it may be necessary to resort to some other rule. As the Supreme Court has pointed out:

> The Court in its construction of the constitutional provision has been careful not to reduce the concept of "just compensation" to a formula. The political ethics reflected in the Fifth Amendment reject confiscation as a measure of justice. But the Amendment does not contain any definite standards of fairness by which the measure of "just compensation" is to be determined. . . . The Court in an endeavor to find working rules has adopted practical standards, including that of market value . . . But it has refused to make a fetish even of market value.

*United States v. Cors, supra,* 337 U.S. at 332, 69 S.Ct. at 1090 (citations omitted).

If it should prove impossible to establish a market value which constitutes just compensation, the basis that now seems to us most deserving of serious consideration—whether as the sole basis or as one to be considered along with NLV we need not now determine—is a basis related to original cost. In contrast to most condemnations, the property is not being converted to new uses; ConRail is being substituted for the transferors. In other words, ConRail has been put in roughly the same position it would have occupied had it made the transferors' original investment when they did and depreciated it at the proper rate.

Thus, a figure related to original cost may have some relevance to the value of what is being transferred. We use the phrase "related to" since not only must allowance be made for depreciation, but a further deduction might be justified to reflect physical deterioration beyond the point provided by the normal depreciation allowances but not constituting CUE.[48] ConRail is being substituted as the operator of a *deteriorated* railroad. Since ConRail must pay for the deterioration when it rehabilitates the property, the Government should benefit through a deduction in its purchase price (except insofar as the deterioration constitutes CUE). From the standpoint of precedent, use of original cost less depreciation finds support in the portion of *PATH* relating to the tunnels. An additional deduction for deterioration would find support in the portion of *PATH* relating to the non-tunnel properties as well as in *In re City of Eureka, supra,* 19 Cal. R.C.D. at 957.

Figures appropriately related to original cost would be entirely "just" to the transferors absent proof of a higher sale value; owners of hopelessly losing properties who are unable to establish a higher net liquidation value would have no just grievance if they receive back their original investment less one or even both of the deductions we have outlined. The Supreme Court's decision in *Roberts* with respect to the easements is authority at least for this. A figure based on original cost has the further advantage of relative ease of determination from records which, except for any deterioration deduction, are readily available in the carriers' reports to the ICC. *See Phillips, The Economics of Regulation* 239 (1965). The Government parties complain that it is not rationally related to the rights of which the transferors have been deprived, and call attention to the portion of Mr. Justice Clark's opinion in *United States v. Toronto, H. & B. Nav'n Co.,* 338 U.S. 396, 403, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949) (footnote omitted), which quoted an economist as saying:

---

**48.** The acronym would be OCLD & D/.

original cost is well termed the "false standard of the past" where, as here, present market value in no way reflects that cost.

Here, however, we have a case where provable market values may be as inaccurate an indication of just compensation as original cost can be in a more traditional proceeding. And the Court was also to say, less than four months after the *Toronto* decision:

> This Court has never attempted to prescribe a rigid rule for determining what is "just compensation" under all circumstances and in all cases. Fair market value has normally been accepted as a just standard. But when market value has been too difficult to find or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards. . . . Whatever the circumstances under which such constitutional questions arise, the dominant consideration always remains the same: What compensation is "just" both to an owner whose property is taken and to the public that must pay the bill?

*United States v. Commodities Trading Corp., supra*, 339 U.S. at 123, 70 S.Ct. at 549 (footnote omitted). While we recognize that this decision, as well as *United States v. Cors, supra*, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392, rejected claims that market value exceeded what the Government deemed to be just compensation, the principle, as stated in the *Commodities Trading* opinion, must work both ways. And what the Government parties regard as a windfall to the owners by an award of more than they can prove to have been obtainable on the market is lessened by the accrual of large prior claims during the lengthy bankruptcy proceedings.

The parties should not read this discussion of original cost to indicate we are bound to it as a factor in valuation. It should be clear that we are not suggesting that a figure related to original cost is the best indication of CMV. Instead, we propose it only as a possible check on shortcomings we fear may develop in the usual valuation method focusing on market values. Furthermore, we would not be surprised to find that revised market value figures were not much different from depreciated original cost. After all, some of the rail property is heavily depreciated and the original cost value of much may be further reduced when deterioration is considered. But in the event a wide disparity should exist, we may not be able to accept as fair any valuation which does not reflect an adjustment related to original cost or a better check on fairness that the parties may suggest. We thus place the parties on notice that we may feel obliged to resort to some kind of analysis related to original cost and that they should present evidence accordingly.

We should also advise the parties, in the interest of their avoiding the expense incident to complex engineering studies, that we do not intend to consider estimates of reproduction cost, variations on that theme such as "assemblage value," value of materials "in place," trended original costs, gross liquidation value or societal values.[49] All these concepts suffer from the basic defect that they are neither values which the transferors were in a position to realize at the time of the taking nor an amount deriving from what they had invested so that there may be some fair claim to having it returned if other methods of arriving at just compensation should fail.[50]

---

49. In this portion of this opinion we shall sometimes use the term "reproduction cost" to embrace these other theories as well.

50. The PC lienholders assert that failure on our part to take account of reproduction cost would discourage investment in railroads or other public utilities. This is a combination of what Professor Bruce Ackerman, in analyzing utilitarian arguments for just compensation, has called the Appeal to General Uncertainty and Citizen Disaffection. *See Private Property and the Constitution, supra* at 44, 49. However weighty such arguments may be in forbidding an award that would be a mere pittance because of insuperable difficulties in establishing fair market value, we fail to see how they support consideration of reproduction cost. No one buys a railroad's bonds or stocks in the expectation that the road will become bankrupt or that the government will take it over if it

This obviously is not a case where reproduction cost evidence should be receivable on a theory of indemnity, i. e., finding the amount the taker should pay to enable the condemnee to reestablish his business elsewhere, as in the *Foley Square* case, 306 F.2d at 448–49, discussed above, since that is something which the transferors do not wish at all. The transferors' assertion of a right to present reproduction cost evidence is based rather on a theory of value to the taker or on some reified notion of property, concepts which we have rejected earlier in this opinion.

Although the transferors have not said what RCNLD would amount to, it is clear that the figures would be tremendous. To take one example, the Penn Central estimated its RCNLD as of December 31, 1970, as some $13 billion as against December 31, 1975 book value of $3.6 billion, FSP, Vol. I, at 142; as a result of inflation the disproportion would probably be greater today. EL estimated its RCNLD as of December 31, 1973, as some $3.6 billion as compared to a book value of $318 million. *Id.* While we understand these figures relate to the entire estates (including non-operating properties) and not simply to the portions transferred, the disproportion remains significant. The railroads in the eastern district have not earned a rate of return on *book value* as high as 4% for the past dozen years; the rates of return for the years ending March 31, 1968, 1969 and 1970 were 1.51%, 1.33% and .37%. *See* The American Railroad Industry: A Prospectus 48 (America's Sound Transportation Review Organization 1970). Moreover, since the Supreme Court's decision in *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), the railroads are not even *enti-*

*tled* to earnings constituting a fair return on a reproduction cost rate base; the ICC permissibly uses a net investment value rate base. *Net Investment-Railroad Rate Base & Rate of Return*, 345 I.C.C. 1494, 1514–42 (1976). *See also* Note, *ConRail and Liquidation Value: Creditors' and Stockholders' Entitlement in the Regional Rail Reorganization*, 85 *Yale L.J.* 371, 375 (1976). It would be a strange notion of "just compensation" that would require the taxpayers to pay so much more for these properties in their deaths than they had been worth during their recent lives. On this point we find *Market Street Railway, supra*, 324 U.S. at 567, 65 S.Ct. 770, although a rate case under the due process clause rather than a condemnation case under the just compensation clause, to be very nearly decisive.

Apart from these basic conceptual defects, resort to reproduction cost as a measure of value in a case like this would lead into a never-never land where this court and the parties would perforce spend long years in the quest of a goal that is unattainable and not worth attaining.

In the first place, despite the deceptive simplicity of the terms, no one knows what RCNLD means. Hartman's book on *Fair Value* at 100 (1920) more than a half-century ago noted that attempts to define the term had developed along three general lines: (1) the cost of reproducing a plant similar in all essentials to the existing plant, under present conditions; (2) the cost of reproducing a similar plant at present prices, under conditions prevailing at the time of original construction; (3) the cost of constructing a substitute plant capable of performing the same service. *Hartman, supra*, at 100. The list in not exhaustive. *See*

does. Still less could investors have expected that in such events the Government would pay many times what could have been obtained by way of a sale or what it had cost to build the railroad in the first instance. All that can be said is that investors in railroad securities reasonably expect that if their property should be taken, they, like all other property owners, will be treated fairly. Applying Professor Acker-

man's formula that under the utilitarian view compensation should be given when and only when $P < U + D$, where $P$ = process costs, $U$ = uncertainty costs and $D$ = the costs of citizen disaffection, p. 48, the test plainly would not be met if P were influenced by reproduction cost. Indeed, there might be citizen disaffection over the payment of what would seem a grossly excessive amount.

*Bonbright* at 152; *Phillips, supra,* at 241–42. Under any of the approaches, the reproduction cost figure would have to be depreciated on some basis to reflect the age and also the deteriorated condition of the present plant, except so far as deterioration might constitute CUE; there would surely be no fairness in taking the cost of building a plant to provide efficient "substitute service" when, due to chronic undermaintenance, the existing service was far below the service of which the older technology was capable. Also, under the circumstances here, there would seem to be no reason for theorizing the construction of a plant "capable of performing the same service" when there is not and may never be a demand for that service; one of the reasons for the transferors' plight has been the underutilization of their plant, *see* PSP, Vol. I, at 4, and there is no assurance that this has been fully remedied by FSP, which was necessarily a compromise to some degree. *See, e. g.* FSP, Vol. II, at 2–5 (light density lines).

Perhaps enough has already been said to illustrate the interminable debate among engineers and other experts which any attempt to arrive at the reproduction cost of the properties here at issue would engender. The experts and ultimately this Court would have to sort out the various senses in which one can "reconstruct" a railroad. Is one required simply to provide service between cities, or does "reconstruction" entail the duplication of all existing spur connections to industrial shippers although they could reach the main line more efficiently by truck? Would the substitute service have to be equivalent to existing service, with slow orders of 10 m. p. h. on much of the track, or would it have to be the equivalent of the service that would have been offered by a well-maintained version of the former railroad? In computing the cost of land for track, freight yards and terminals, must one assume use of the existing sites, or may cheaper ones be substituted? On either view, is one to take account of increased land values due in part to the presence of the railroad and in part to the efforts of others; or is one interested in what it would cost to reconstruct a railroad if the existing ones had never existed?

These definitional difficulties are augmented by additional problems of calculability. While some of these have been anticipated in our discussion, further elaboration may be useful. Perhaps the most difficult question is how to make allowance for functional depreciation. Mr. Justice Brandeis thought that functional depreciation should encompass not only "progress in the art of rail transportation" which has reduced the value of the existing plant, *St. Louis & O'Fallon Ry. v. United States,* 279 U.S. 461, 523, 49 S.Ct. 384, 401, 73 L.Ed. 798 (1929) (Brandeis, *J.,* dissenting) but also changes in the volume or character of a railroad's traffic or in the nature of the community it serves that would lead to alteration in rail system design if the railroad were to be rebuilt. *See also* 2 *Orgel* at 111; *Bonbright* at 161, 168, 215.

The uncertainties in calculating functional depreciation are rivalled by the difficulties of arriving at the initial estimate for RCN. In his *O'Fallon* dissent, Mr. Justice Brandeis noted, in terms fully applicable here, that "there was practically no construction of new lines" during the recapture years there in question, making it very difficult to estimate current construction costs; on the other hand, indexing construction costs from earlier years was unsatisfactory since it gave no effect to new cost-saving methods of construction, 279 U.S. at 544–45, 49 S.Ct. 384. *See also Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Comm'n,* 262 U.S. 276, 299–300, 43 S.Ct. 544, 67 L.Ed. 981 (1923) (Brandeis, *J.,* dissenting); *Bonbright* at 166–67.

Commissioner Eastman of the ICC also considered that RCN estimates were unreliable, for they were "based on all manner of assumptions, and invade the realm of fancy at numerous points." He cited, as one example, not without applicability here, that the estimate of RCN for a given segment of railroad would depend on how many other railroads were hypothetically being reproduced, since it is more expensive to construct a railroad if no other railroads are available for the transport of construction

materials. *San Pedro, Los Angeles & Salt Lake R.R.*, 75 I.C.C. 463, 530 (1923) (dissenting opinion), *modified*, 103 I.C.C. 398 (1925).[51]

Another type of objection to RCN as a valuation method is based at root on considerations of equity. RCN under prevalent methodology would take no account of the fact that the original construction of the railroad was done in a timely fashion. In regard to land, for instance, basing the value on the current market price of adjoining land would amount to positing the reconstruction of the railroad with the least efficient timing possible in the development of an industrial area. *See San Pedro, Los Angeles & Salt Lake R.R., supra*, 75 I.C.C. at 549. Judging the RCN of land by the current value of adjoining real estate has in addition the unwarranted effect of penalizing state and local governments for public improvements undertaken by them. The increased value of the land on which a railroad has been built is the result not simply of the construction of the railroad but of what the New York Court of Appeals has recently termed "the massive and indistinguishable public, governmental and private contributions," *Penn Central Transportation Co. v. New York City*, 42 N.Y.2d 324, 333, 397 N.Y.S.2d 914, 919, 366 N.E.2d 1271, 1276 (1977).

Finally, it is hard to see why investors, and particularly bondholders in bankrupt railroads, should enjoy a bonus for the effect of inflation not accorded to most other citizens. Commissioner Eastman inquired in his *San Pedro* dissent, 75 I.C.C. at 532:

> [W]hy should public utility investors be constituted a favored class exempt from

the hardships suffered by other investors due to the change in the purchasing power of the dollar?

*See also* Mr. Justice Brandeis in *Southwestern Bell, supra*, 262 U.S. at 305, 307, 43 S.Ct. 544. While in fixing rates for operating utilities it may well be necessary to take appropriate account of the increased cost of replacing facilities constructed at substantially lower prices, there is no corresponding consideration here.

The difficulties in the use of RCNLD are not decreased by the suggestion of some of the transferors, apparently embarrassed at the size of the award on a reproduction cost theory alone, that we need not take RCNLD as "the value" but simply as a factor to be considered along with OCLD and NLV in arriving at value. Rather they are augmented. As Commissioner Eastman noted in his *San Pedro* dissent, it is one thing to apply RCN as a check on estimates of OC when the range between the two is narrow, but is a quite different thing when a long period of price change has produced a vast difference between the two. Under such circumstances the choice of a figure becomes increasingly arbitrary. 75 I.C.C. at 553–54.[52]

We are told that, however all this may be, authority compels us to plod into the morass of taking evidence on RCNLD "for whatever it may be worth"—the hope being apparently that a decade hence, when this job has been completed,[53] we—more accurately, our successors—will have a different perception of the bearing of such figures than we do now. We have already discussed and rejected the lines of authority that are most nearly pertinent although not

---

**51.** *See also* 1 *Kahn, The Economics of Regulation: Principles and Institutions* 39 (1970), quoting 2 *Lyon & Abramson, Government in Economic Life* 691 (1940).

**52.** Commissioner Eastman stated:

> I must confess that it seems to me that unless some definite standard can be found for determining the weight to be given to such widely conflicting evidence, the process of valuation will become arbitrary to a degree wholly impossible to defend. Value will become a speculative and capricious matter,

varying millions of dollars upon exactly parallel sets of facts, dependent upon the bent of mind, temper, and perhaps, digestion of the particular individuals who happen to exercise the "judgment."

*Id.*

**53.** We are quite serious about the time estimate. The ICC's valuations of the country's railroads under § 19a of the Interstate Commerce Act required 19 years. *See* III–A *Sharfman, The Interstate Commerce Commission* 39–40 (1935).

sufficiently so as to be persuasive. Only a little more needs to be said.

One line of cases, cited to us not as binding authority but as "an instructive analogy to the present valuation task", Reply Brief of Intervening PC Lienholders at 42–47, consists of decisions of the ICC under § 3(5) of the Interstate Commerce Act:

> If the Commission finds it to be in the public interest and to be practicable without substantially impairing the ability of a common carrier by railroad owning or entitled to the enjoyment of terminal facilities to handle its own business, it shall have power by order to require the use of any such terminal facilities, including main-line track or tracks for a reasonable distance outside of such terminal, of any common carrier by railroad, by another such carrier or other such carriers, on such terms and for such compensation as the carriers affected may agree upon, or, in the event of a failure to agree, as the Commission may fix as just and reasonable for the use so required, to be ascertained on the principle controlling compensation in condemnation proceedings.

49 U.S.C. § 3(5).

The leading decision under § 3(5) (at the time, § 3(4)) is *Missouri-Kansas-Texas R.R. v. Kansas City Terminal Ry.*, 198 I.C.C. 4 (1933) (*MKT*). The Commission there sought to fix the compensation to be paid to Kansas City Terminal (KCT) for MKT's use of portions of the terminal facility. The Commission first disposed of preliminary contentions, ruling that since MKT was in effect a tenant, just compensation could be in the form of rental payments, rather than in a lump sum. The Commission also directed MKT to pay a rental based on its numerical share (as one of 12 users of the property) *rather than on a user basis*. Moving to the determination of the fair value of the property, the Commission discussed the valuation principles it thought applicable:

> Before proceeding to discuss the evidence and our conclusions relative thereto, we repeat it is our interpretation of the statute that the principles controlling compensation in condemnation statutes are fully applicable and appropriate to determine the value of the property for the use of which compensation is to be made. Insofar as the rules, methods, and principles laid down by us in our valuations under section 19a of the act are applicable, we shall be controlled thereby. At the same time we recognize the distinction between the controlling principles applicable for the ascertainment of values for rate-making purposes and those applicable in condemnation cases. We do not perceive, however, why the principles applicable for the determination of individual elements, such as cost of reproduction, cost of reproduction less depreciation, and original cost, should be any different in the instant case from those in the rate-making case. It is true that certain facts—earnings for instance—may be relevant in condemnation cases while irrelevant in rate-making cases, but if the facts are relevant the controlling principles in their ascertainment should be the same.

198 I.C.C. at 14.

This seems to us little more than saying that the Commission proposed to apply its *San Pedro* and *O'Fallon* decisions concerning the factors to be taken into account in valuation for rate-making purposes under § 19a as a guide for its decisions under § 3(5). *See also* III–A *Sharfman, supra*, at 124 (noting that § 19a was "a statutory replica [of] *Smyth v. Ames* [169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819]"). The undermining of *San Pedro* and *O'Fallon* by the Supreme Court's decision in *Hope Natural Gas* deprives *MKT* and its progeny, including cases that applied *MKT* in fixing fair and equitable terms and conditions for acquisitions under § 5(2), *e. g., Use by Erie R.R. of Niagara Junction Railway Terminals*, 278 I.C.C. 425 (1950), of any precedential authority for us.

The Brief of the PC Lienholders at 161–62 & n.145, also tells us that "In public utility condemnation cases the reproduction cost of the facility is invariably a significant measure of value," and that "Reliance

on reproduction cost is common in federal and state courts." Some of the cases cited are ratemaking cases, which must be deemed to have been overruled by *Hope Natural Gas, see Market Street Railway, supra,* 324 U.S. at 566–68, 65 S.Ct. 770. One of the condemnation cases cited is *PATH,* which, as we read it, gave no weight to reproduction cost for the losing tunnel properties. Another is *Fifth Avenue Coach.* We have declined to follow that case in other respects; moreover, whatever authority it might have lent to the use of reproduction cost in valuing an unprofitable utility is undermined by the subsequent decision of the same court in *PATH.* One case cited, *In re City of Oroville, supra* [1922E] P.U.R. at 469–70, quite clearly rejected RCN and RCNLD. Still other cases have been discussed in Part IV(A)(5) of this opinion.

More clearly inapplicable are cases in which there is no indication that the utility was hopelessly unprofitable, *City of Omaha v. Omaha Water Co.,* 218 U.S. 180, 30 S.Ct. 615, 54 L.Ed. 991 (1910); *Albert Hanson Lumber Co. v. United States,* 261 U.S. 581, 43 S.Ct. 442, 67 L.Ed. 809 (1923); *Wichita Water Co. v. City of Wichita,* 271 F. 973 (D. Kansas 1921), *rev'd,* 280 F. 770 (8 Cir. 1922), *City of Baxter Springs v. Bilger's Estate,* 110 Kan. 409, 204 P. 678 (1922), or in which it is clear from the opinion that the condemned utility was profitable or likely to become so. *National Waterworks Co. v. Kansas City,* 62 F. 853 (8 Cir. 1894); *United States v. Boston, Cape Cod and N. Y. Canal Co., supra,* 271 F. 877; *Puget Sound Power and Light Co. v. Public Utility Dist. No. 1,* 123 F.2d 286 (9th Cir. 1941), *cert. denied,* 315 U.S. 814, 62 S.Ct. 798, 86 L.Ed. 1212 (1942); *City of Phoenix v. Consolidated Water Co.,* 101 Ariz. 43, 415 P.2d 866 (1965); *Dade County v. General Waterworks Corp.,* 267 So.2d 633 (Fla.1972); *Kennebec Water Dist. v. Waterville,* 97 Me. 185, 216, 54 A. 6, 19 (1902); *Montgomery County v. Schuylkill Bridge Co.,* 110 Pa. 54, 20 A. 407 (1885); *Borough of Hanover v. Hanover Sewer Co.,* 251 Pa. 95, 96 A. 132 (1915); *Appleton Waterworks Co. v. Railroad Comm'n, supra,* 154 Wis. 121, 142 N.W. 476. RCNLD may

be a tenable measure of the value of the opportunity to continue a profitable enterprise, as we have noted, but it has no relevance here.

Beyond this, many of these cases stem from the heyday of *Smyth v. Ames* and even more extreme Supreme Court decisions extolling the role of reproduction cost in public utility valuation for rate-making purposes, e. g., *McCardle v. Indianapolis Water Co.,* 272 U.S. 400, 47 S.Ct. 144, 71 L.Ed. 316 (1926). It is natural that this should have had a spillover into public utility condemnation; and when the utility was a profitable one, earning a return on a RCNLD rate base, reference to RCNLD as a factor would have been not only natural but perhaps defensible, see the remarks of later Chief Justice Taft as a dissenting arbitrator in *Grand Trunk Ry. v. Rex* [1923] A.C. 150, 162–63 (Privy Council) and *Bonbright* at 156, although it is hard to see just what evidence of RCNLD added to the capitalization of earnings upon it that would have gotten to the point more directly, *see* 2 *Orgel* § 210, at 89. The remarks in 2 *Orgel* § 210, at 88 and in *Bonbright* at 151 and 153 can be similarly explained; neither asserts that replacement costs must be considered in the condemnation of a losing public utility.

In sum, the time has come "to lay the ghost of *Smyth v. Ames,*" *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 602, 62 S.Ct. 736, 750, 86 L.Ed. 1037 (1942) (Black, Douglas and Murphy, JJ., concurring), not only in ratemaking but, to such extent as it has lingered there, in eminent domain, except under such special circumstances as existed in the *Foley Square* case, *supra,* 306 F.2d at 447–48, and in the cases involving condemnation of property not held for profit. Reproduction cost evidence should be received in condemnation proceedings only when, as in such cases, it affords needed assistance to a court in finding what will be an appropriate indemnity for an owner wishing to continue to devote his property to its existing use. That, as we have several times pointed out, is not this case. We thus will not permit the

masters to take evidence on reproduction cost, assemblage value, value of materials "in place," trended original cost, gross liquidation value or societal values unless a particular transferor can bring himself within the principle of *Foley Square*.[54] While the transferors are free to make offers of proof on any or all of these themes, we strongly suggest that they curtail expenditures on such studies to the minimum needed to enable them to make intelligible offers of proof; in turn, we shall not fault them for any deficiencies in the offers resulting from such a curtailment.

## V. *Sales to Other Public Bodies*

In this section we deal further with the argument of the Government parties that the alternative scenario may not include sales to other public bodies or, at minimum, may not include sales to such bodies by way or in lieu of condemnation. We have previously indicated in Part III that, as a matter of statutory construction, we see no reason why such sales should not be includible in determining NLV; however, that would serve little purpose if they were required to be excluded for purposes of determining CMV.

In this Court's June 16, 1976 Memorandum, we requested briefing of the question whether, in determining NLV under § 306, account should be taken of potential rail use sales at prices greater than nonrail NLV "when the proposed sale is to a public body vested with the power of eminent domain,

in the absence of proof of a private purchaser ready and willing to make the purchase?" 425 F.Supp. at 283. The consequent briefing centered on one aspect of that question: whether any such public (or private) purchasers would in fact pay more than salvage value, with the Government parties arguing that they would not in light of the claimed ability and policy of the ICC to condition permission to abandon with a "salvage value clause" requiring the applicant to sell for continued operation at not less than net salvage value. We indicated in our October 18, 1976 Opinion that we were not persuaded by the Government's contention that such clauses had any effect other than that, as between two purchasers neither of which was willing to pay more than scrap value, the railroad must prefer the one that would continue operations, and that the willingness of a public body, even in the absence of competition, to pay more than scrap value, was a matter of proof, *see* 425 F.Supp. at 271–73. We now reaffirm that initial conclusion, along with our rejection, *id.*, of the Government's broader assertion that ICC regulation in the absence of the Act would and could have reduced the price for all rail use dispositions to nonrail NLV; *see* pp. 1010–1011 & n.19 *supra*.

As a result, another aspect of the question of sales to public bodies, previously somewhat obscured by the controversy over the salvage clause, becomes significant. This is whether, assuming that public bod-

54. We also reject the contention that the transferors are entitled to an allowance for the "going concern" value of their properties despite their unprofitability. Most of the cases cited which allow compensation for going concern value involve profitable utilities, *e. g., National Waterworks Co. v. Kansas City, supra,* 62 F. at 865, *City of Phoenix v. Consolidated Water Co., supra,* 101 Ariz. at 46, 415 P.2d at 869; *Dade County v. General Waterworks Corp., supra,* 267 So.2d 633; *Brunswick & T. Water Dist. v. Maine Water Co.,* 99 Me. 371, 376, 59 A. 537, 539 (1904); *Borough of Hanover v. Hanover Sewer Co., supra,* 251 Pa. at 99, 96 A. at 134; *Oshkosh Waterworks Co. v. Railroad Comm'n,* 161 Wis. 122, 131, 152 N.W. 859, 863 (1915). One case, *City and County of San Francisco v. Pacific Gas & Electric* [1929E] P.U.R. 529 (Cal. Railroad Comm'n 1929), concerned property

taken from a company that continued in business. In another decision, which did involve an unprofitable utility, In re *Fair Oaks Irrigation Dist., supra* [1918C] P.U.R. at 884, the California Railroad Commission noted only that it would give some consideration to net earnings, of which the utility had none.

We have already indicated our disagreement with the holding of *Fifth Avenue Coach, see* pp. 1021–1022, *supra*. To the extent that *PATH, supra,* 20 N.Y.2d at 471–72, 285 N.Y.S.2d at 33, 231 N.E.2d at 740, followed that decision with respect to going concern value, we disagree with it as well. As Judge Burke observed in his *PATH* dissent, "Economic viability, i. e., the capacity to operate at a profit, is . . . the *sine qua non* for an award of going concern value." *Id.* at 480–81, 285 N.Y.S.2d at 40–41, 231 N.E.2d at 740.

ies would in fact pay more than salvage value, it is permissible as a matter of condemnation law to include them in the market. The Government parties claim that, absent a showing that the purchase would have been made in the expectation of profitable operation, it is not. The argument is that consideration of state and local governmental bodies as purchasers, *first*, would run contrary to the eminent domain principle that even actual increases in private market value are not compensable if attributable to the same public project for which the property was taken, and, *second*, that taking account of such prospective purchasers would unacceptably burden the exercise of federal power.

■ The Government's invocation of the "same project" limitation on actual market value as of the time of the taking is unavailing. We follow the Government parties in their claim that any increases in market value resulting from the *taker's* project are to be excluded in computing the amount the taker must pay. *See Shoemaker v. United States*, 147 U.S. 282, 303–05, 13 S.Ct. 361, 37 L.Ed. 170 (1893); *United States v. Miller, supra*, 317 U.S. at 375–77, 63 S.Ct. 276; *United States v. Cors, supra*, 337 U.S. at 332–34, 69 S.Ct. 1086, 93 L.Ed. 1392. But the putative interest of a public body in acquiring properties for continued rail use is independent of the effort by the Federal Government, the taker in this case, to secure such a continuation through the Rail Act. The proposition that a condemnee is not entitled to compensation for demand attributable to the taker's very project does

not compel the conclusion that he is not entitled to value for uses for which other condemnors would have paid in order to serve the same purpose—preservation of rail service—as is served by the actual taker's project;[55] to employ the "same project" vocabulary is only to state the public sales issue here under consideration in another way.[56]

The Government's reliance on the decision in *United States v. 124.21 Acres of Land*, 458 F.2d 568 (8 Cir. 1972), on this score is misplaced. The court there indicated that demand for borrow material created by the interstate highway project for which the material was taken by the Federal Government could not be considered. It refused to consider as market value prices previously paid by the state of Minnesota for such material, apparently because that purchase also had been for use on the same highway construction. Exclusion of the state's purchase on this ground was simply an unexceptional application of one aspect of the same project doctrine; unlike the issue here with respect to purchases by public bodies, Minnesota's demand for the fill dirt was a direct result of the project of the federal government, the taker.

Such Supreme Court opinions as exist lend support to the proposition that other potential condemnors may be considered, although the Court's discussion has not been altogether clear. The lack of clarity is largely due to the fact that the cases, like those dealing with inclusion of the taker in the market, *supra*, Part IV, generally deal

---

**55.** This distinction is not called into question by application of the "same project" rule to a federal taking for the use of a local government, *see United States v. First Pyramid Life Ins. Co.*, 382 F.2d 804, 806–07 (8 Cir. 1967), or to situations involving related condemnations by the federal government and a state, *compare United States v. 137 Acres of Land*, 406 F.2d 1283 (6 Cir. 1969), *with United States v. 390.71 Acres of Land*, 352 F.Supp. 735 (E.D.Ill. 1972).

**56.** We do note that, wholly apart from the necessity of excluding from the alternative scenario other possible federal responses to the rail crisis, the reasoning of the "same project" cases would require the exclusion of public

sales whose likelihood is premised on a federal taking of other rail properties (for example, of connecting lines), for in such a case the amount to be paid by the taker would be increased by demand for which his taking was a necessary condition. And we again note that proof of public sales will have to contend with "[the Government's] claim that a state would not be interested in making the substantial payments required for taking over main line (as distinguished from commuting) operations without assurance that other states would take similar action to the extent required to constitute a viable system." October 18 Opinion, 425 F.Supp. at 273 n.5.

also with a separate issue—whether a condemnee is entitled to values that could be realized only if his property were united with those of others. The general answer is that when this could be accomplished only by someone's exercise of eminent domain, he is not. *See McGovern v. New York, supra*, 229 U.S. 363, 33 S.Ct. 876, 57 L.Ed. 1228; *City of New York v. Sage, supra*, 239 U.S. 57, 36 S.Ct. 25, 60 L.Ed. 143; *United States ex rel. Tennessee Valley Authority v. Powelson, supra*, 319 U.S. at 275–79, 63 S.Ct. 1047. *See also In re Bensel*, 230 F. 932 (S.D.N.Y.1916) (remand of *Sage*) (L. Hand, J.). This follows logically from the rule which excludes value to the taker, as such land has assemblage value only to a taker with eminent domain power, not to a seller who lacks such power.

Probably the leading case on the inclusion in the market of public bodies other than the taker is *Olson v. United States, supra*, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236. The Court there considered whether reservoir use was relevant to the just compensation owed for a taking of certain flowage easements.[57] In the course of affirming the exclusion of reservoir use on the ground that such use was insufficiently probable absent the taking, the Court said, 292 U.S. at 256, 54 S.Ct. at 709:

> . . . The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value. Nor does the fact that it may or is being acquired by eminent domain negative consideration of availability for use in the public service. *New York v. Sage*,

239 U.S. 57, 61 [36 S.Ct. 25, 60 L.Ed. 143]. It is common knowledge that public service corporations and others having that power frequently are actual or potential competitors, not only for tracts held in single ownership but also *for rights of way*, locations, sites and other areas requiring the union of numerous parcels held by different owners. And, *to the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account.* (Emphasis supplied.)[58]

Although the opinion thus referred to the "most profitable use" of the property, the Government parties' effort (Government Br. at 254–55 n.299) to limit the Court's language to cases where public buyers are looking to the profitability of the property in question is unpersuasive since it seems more likely that the Court meant only to refer to the idea of most advantageous use in the sense of that yielding the highest price to the condemnee. The actual holding that reservoir use was too speculative, 292 U.S. at 260, 54 S.Ct. 704, was based rather on the Court's conclusion that the condemnee had not sustained the burden of showing that in fact there were other potential purchasers or condemnors for reservoir use.

The opinions in *United States v. Miller, supra*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, and *United States v. Cors, supra*, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392, also contain language suggesting that other public bodies vested with the condemnation power may be included in the market. In *Miller*, the Court said, 317 U.S. at 375, 63 S.Ct. at 280:

---

**57.** Although the condemnation statute there provided for compensation in accordance with the constitution of Minnesota, 292 U.S. at 250, 54 S.Ct. 704, the Court noted that that standard "is not, at least so far as concerns these cases, to be distinguished from that expressed by the just compensation clause of the Fifth Amendment and implied in the *due process* clause of the Fourteenth Amendment to the Federal Constitution," *id.* at 254, 54 S.Ct. at 708.

**58.** The Court here cited *Boom Co. v. Patterson, supra*, 98 U.S. 403, 25 L.Ed. 206, where an

award including use of the condemned property for boom purposes was upheld on the ground that such use was available to persons other than the taker, although the opinion seemed to assume that adaptation for boom use would not require an exercise of eminent domain by the supposed other users and did not indicate whether such users included public bodies. *See* 98 U.S. at 408–09, 25 L.Ed. 206 and the discussion of the case in 1 *Orgel* § 90, at 376.

[A]lthough the market value of the property is to be fixed with due consideration of all its available uses, its special value to the condemnor *as distinguished from others who may or may not possess the power to condemn*, must be excluded as an element of market value. (Footnotes omitted, emphasis supplied.)

*See* Note, *supra*, 90 *Harv.L.Rev.* at 600 n.20. To the same effect, the *Cors* Court stated, 337 U.S. at 333, 69 S.Ct. at 1091:

The special value to the condemnor *as distinguished from others who may or may not possess the power to condemn* has long been excluded as an element from market value. (Emphasis supplied.)

In both instances, the Court cited *United States v. Chandler-Dunbar Co., supra*, 229 U.S. at 76–77, 33 S.Ct. at 677, where value for lock and canal use was included:

The exception taken to the inclusion as an element of value of the availability of these parcels of land for lock and canal purposes must be overruled. That this land had a prospective value for the purpose of constructing a canal and lock parallel with those in use had passed beyond the region of the purely conjectural or speculative. That one or more additional parallel canals and locks would be needed to meet the increasing demands of lake traffic was an immediate probability. This land was the only land available for the purpose. It included all the land between the canals in use and the bank of the river. Although it is not proper to estimate land condemned for public purposes by the public necessities or its worth to the public for such purpose, it is proper to consider the fact that the property is so situated that it will

probably be desired and available for such a purpose. Lewis on Eminent Domain, § 707. *Boom Co. v. Patterson*, 98 U.S. 403, 408 [25 L.Ed. 206]; *Shoemaker v. United States*, 147 U.S. 282 [13 S.Ct. 361, 37 L.Ed. 170] . . . . .

The *Miller* and *Cors* Courts apparently read this not as a departure from the general rule against taking account of value to the taker but as indicating that value for the same *purpose* as the taker's to other purchasers or condemnors is includible.[59]

Despite all this we find appreciable force in the Government parties' argument that considering other public purchasers might threaten the ability of the federal government to solve national problems through use of the condemnation power whenever the problem also impacts at the state and local level—a point which does not appear to have been brought to the Supreme Court's attention in any of the cases we have discussed. The effective result of including such purchasers in the market, the Government says, would be that despite the disallowance of "hold up" value when considering the condemnee-federal condemnor relationship, we would then allow a similar "hold up" to enter the calculation of just compensation through the back door of hypothetical dispositions to other public bodies. It is not a sufficient answer to say that doing this does not bar the federal government from resort to condemnation solutions but affects only the just compensation figure. (*See* EL reply brief at 13.) If a state or local government, by an improvident arrangement with the condemnee, could dictate what the Federal Government must pay for its decision to condemn, the federal

---

**59.** To be sure, that portion of *Chandler-Dunbar* has been narrowly confined, *see United States v. Twin City Power Co.*, 350 U.S. 222, 226–27 n.*, 76 S.Ct. 259, 100 L.Ed. 240 (1956); *United States v. Rands*, 389 U.S. 121, 126–27, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967), though not so as to exclude consideration of other public purchasers.

There is one oddity here. Aside from relying on *Boom Co. v. Patterson*, discussed in note 58, *supra*, the *Chandler-Dunbar* Court's supporting discussion of *Shoemaker v. United States, supra*, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170,

shows that the Court thought *Shoemaker* had approved an instruction that if the taken property " 'is peculiarly adapted to some particular use—e. g., to the use of a public park—all the circumstances which make up this adaptability may be shown, and the fact of such adaptation may be taken into consideration in estimating the compensation,' " *see* 229 U.S. at 78, 33 S.Ct. at 678, while in fact *Shoemaker* approved the refusal to give that instruction. *See Shoemaker, supra*, 147 U.S. at 304–05, 13 S.Ct. 361; 1 *Orgel* at 364–65.

condemnation power would in some degree be 'hostage to those levels of government.

■ The problem is sufficiently troubling that we think it preferable, before attempting anything like a complete resolution, to await factual development which will enlighten us as to the true dimensions of the issue. The Government is clearly entitled to be protected against prices that would represent simply the appraisal of a state or local body of how much it would pay under duress rather than have service cut off. Payment of any such price would be unreasonable. The state and local bodies themselves had or could readily have been given the power of eminent domain, including power to take title without contemporaneous payment so long as they recognized "the absolute right of the owner, upon his property being taken, to just or reasonable compensation therefor, and [made] provision . . . for the ascertainment . . of the compensation to which, under the constitution, he is entitled." *Sweet v. Rechel*, 159 U.S. 380, 404, 16 S.Ct. 43, 50, 40 L.Ed. 188 (1895). Value to the taker should no more be admissible in state than in federal condemnation. Also, under the special circumstances of this case, the Federal Government should not be deemed a potential buyer in a hypothetical state or local condemnation; Congress was clearly willing to bow out if state or local bodies would come in. Beyond that we deem it best to rest for the present on what we have previously said, 425 F.Supp. at 273.

### VI. *Severance Damages*

Our June 16, 1976 order requested briefing and argument on the issue whether compensation was due for "any diminution in value of the assets severed and then left with the transferors, on a theory of inverse condemnation or otherwise." 425 F.Supp. at 287.

To no one's surprise the transferors answer in the affirmative, referring to 4A *Nichols, supra* § 14.231 and the many authorities there cited. While asking that we endorse this general proposition, the PC Trustees consider that it would be unwise

for us to go further at this time since the method for computing severance damage may vary according to the general theory of valuation that is adopted.

Not disputing the general principle advanced by the transferors, the Government parties urge that it can have little or no application in this case since the condemned rail properties have been taken for continued rail use. Accordingly "[W]hat was railroad property stays in rail use, and what was railroad frontage remains railroad frontage after the Government has acted." (Govt. brief at 239). It follows, they say, that "any 'severance damage' claim must be based on an allegation that retained properties could have been combined with transferred properties to produce greater aggregate value in the absence of the Rail Act" (Govt. brief at 242) and that all this will be reflected in "the alternative scenario."

While the formulation of the Government parties may cover most of the instances of severance damage, we are not satisfied that it would cover all. Moreover, to insist that all claims of severance damage should be handled by the alternative scenario approach might well put an undue strain on this already heavily burdened device. If a transferor prefers to attempt to establish severance damage on a parcel-by-parcel basis, we do not now perceive any reason for preventing this.

■ However, we agree that for us now to say more would be premature. We therefore content ourselves with the statement that we see nothing that should prevent application of the principle of severance damage in this case.

### VII. *The New Haven*

In our June 16, 1976 memorandum we asked for briefing and argument on a "question raised by the statement of the New Haven Trustee, whether there is any requirement that the properties conveyed by the New Haven to PC should be valued on any higher basis than other properties," 425 F.Supp. at 287, and allowed the Trustee to intervene "for the limited purpose of

presenting contentions pertaining *specifically* to properties transferred by the New Haven estate to Penn Central." *Id.* at 288. (Emphasis supplied). Disregarding this limitation, as he had in his brief on CUE, counsel for the New Haven Trustee has filed a brief and reply brief totaling 104 pages, in which the only specific reference to the New Haven is a conclusory statement in a footnote:

". . . the findings of the Supreme Court with respect to value of the New Haven properties established the net salvage value of those properties as of December 31, 1966, and, after proper adjustment to date of conveyance to ConRail, set an absolute floor on the salvage value of the New Haven properties in these proceedings." Br. at 4 n.4.

■ We agree with the Government parties that the former New Haven properties should not be valued differently in these proceedings simply because they were the subject of valuation at the time of their sale to Penn Central. As previously noted, note 42, *supra*, that valuation stemmed from an agreement between Penn Central and the NH Trustees. While the Government was a party to the *New Haven Inclusion Cases*, its interest was that of supporting the ICC's orders and was not that of a condemnor. Moreover, what was there determined was the liquidation value of the entire NH as of December 31, 1966; the question here is the value of what remained of a portion of those properties,[60] after further physical deterioration, as part of the Penn Central on April 11, 1976.[61] We shall expect the NH Trustee in the future to observe the limitation placed on his intervention; indeed, we see little need for his further participation in these general proceedings as distinguished from proceedings relating specifically to former NH properties.

---

**60.** One of the most important assets conveyed by the New Haven to PC, its interest in "the Park Avenue properties" in New York City, was not conveyed in 1976.

**61.** It goes without saying that we intimate no view as to how the claims of the New Haven Trustee against Penn Central are to be treated by the Penn Central reorganization court.

## VIII. *Value of Other Benefits (VOB)*

In Part IV of our Memorandum of June 16, 1976, 425 F.Supp. at 284, we directed USRA to file a more detailed explanation and calculation of VOB than was contained in the FSP, with the hope that this would enable us to rule on issues of principle and thereby reduce the need for further discovery or factual presentations. As noted at the beginning of this opinion, after this statement was filed we fixed a briefing schedule which permitted the VOB problem to be brought on for argument at the same time as the other issues dealt with in this opinion.

The December 1, 1976 Statement of the Government parties gave this subject a turn we had not expected. Departing from the analysis in FSP, Vol. I, pp. 128–34, the Government parties drew a sharp distinction between what their VOB claims would be under the alternative constitutional claims they assert the transferors are entitled to make: First, "they are entitled to assume the *presence* of the Rail Act" and to claim a right to withdraw *all* their properties from rail use. Value is calculated using the MLP. Second, "they are entitled to assume the *absence* of the Rail Act, and try to establish the values they could have attained by liquidating the transferred properties, for rail *or* non-rail use . . . ," under an alternative scenario.[62] Statement at 5 (emphasis added).

Under the first hypothesis the Government's VOB claims are limited to two categories: One is a "technical adjustment" for part of the enhancement in value of a portion of a retained parcel of land by virtue of its access to ConRail service. The other category is the elimination of claims that would have been reached in a reorganiza-

---

**62.** The Statement made no attempt to analyze what the Government's VOB claims would be on other valuation theories urged by the transferors, saying only that "VOB would, of course, be present on all such theories." P. 2 note*.

tion to the extent that these exceed the value of the related properties. Illustrative and most important is ConRail's assumption of equipment obligations. Section 303(b)(3)(A)(ii) provides in part that conveyance of rolling stock (defined to include locomotives, freight and passenger cars, and work equipment) may be effected only if—

(I) the Corporation [or other persons] to whom such conveyance is made assumes all of the obligations under any applicable conditional sale agreement, equipment trust agreement, or lease with respect to such rolling stock (including any obligations which accrued prior to the date on which such properties are conveyed)

. . . .

The Government parties contend that the transferors received OB to the extent that the liquidation value of rolling stock transferred under the Act was less than the assumed obligations upon it that would have been reached in the respective bankruptcy proceedings.

As compared with these two items, the Statement lists, without limitation, five other items which the Government parties would claim as VOB if any part of the rail properties of a transferor were to be valued under a scenario providing for continued rail use in the absence of the Rail Act: (1) expedition of and exemptions from regulatory action; (2) avoidance of operating costs after April 1, 1976; (3) avoidance of executory contracts and inchoate obligations; (4) avoidance of labor protection costs; (5) and avoidance of loss on retained properties to the extent that the FSP provided more rail service than an alternative scenario would have done.[63] All these claims are hotly disputed by the transferors.

The briefs have also flushed out a legal point that had escaped our attention. Section 303(c)(1)(A)(i) directs us to decide whether the transfers or conveyances to ConRail "in exchange for the securities, certificates of value and the other benefits accruing to such railroad as a result of such exchange" are fair and equitable; § 303(c)(1)(A)(ii) directs us to decide whether the transfers or conveyances to profitable railroads, States or responsible persons "in exchange for compensation and other benefits accruing to such transferor as a result of such exchange" are fair and equitable.[64] On the other hand, § 306(c)(4) provides that determination of the base value of the CV's involves

subtracting the value of other benefits provided under this Act, as determined by the special court. . . .

Most of the transferors contend that the omission of the "as a result of such exchange" language in § 306(c)(4) was simply permissible Congressional shorthand and does not indicate any intention that we should determine VOB on any more enlarged basis under § 306(c)(4) than under §§ 303(c)(1)(A)(i) and (ii). We do not understand that the Government parties seriously dispute this. We hold the meaning to be the same;[65] when Congress in § 306(c)(4) used the phrase "as determined by the special court," it referred to the determination we had been directed to make under §§ 303(c)(1)(A)(i) and (ii). The omission of the phrase "as a result of such exchange" will therefore not be considered significant.

There is less agreement over the effect of that qualifying phrase. However, it would be wasteful to review the somewhat abstruse arguments that have been presented on that issue until we know just what OB

---

**63.** The Government parties recognize that *some of these items might be taken as deductions* in the alternative scenario itself; to that extent, of course, they should not be counted again as OB.

**64.** The "as a result" language was contained in § 303(c)(1)(A)(i) of the Act as enacted in 1974. The 1976 amendment added to both subsections: "(taking into consideration compensable unconstitutional erosion, if any, which the spe-

cial court finds to have occurred in the estate of each such railroad during the bankruptcy proceeding with respect to such railroad)."

**65.** The NH Trustee suggests that the language of § 303(c)(4) may be *more* restrictive because of its use of the words "provided under this Act." Brief at 5 n.7. We reject this suggestion.

are claimed and allowed. And this, as almost all parties agree, will depend on both the theory of value and the specific hypothetical dispositions of rail property put forward by the transferors. We have therefore concluded that it would be unprofitable for us to endeavor further to clarify the subject of VOB at the present time. '

## IX. *Conclusion*

As we review this opinion, we must confess some disappointment at the rather meager results which the extensive briefs and arguments of able counsel and our intensive consideration of them have produced. However, our malaise goes deeper. Even on the chart we have drawn for the future course of these proceedings, a chart which the transferors will doubtless claim to have wrongly precluded many lines of pertinent proof, the parties and this court seem doomed to spend years in an enterprise as unsatisfying as it will be interminable. We are to endeavor to fix the values of these enormous properties by estimating what the transferors could have realized by engaging in one course of action—ceasing operation and selling all of the property as scrap—that was never seriously considered by anyone, or another—an endeavor by each of the transferors to find a buyer or buyers for parts or all of its lines and selling the rest for scrap—that was not explored because it had become evident early in 1973 that something like the Rail Act would be adopted. Although the estimation of scrap value would not be simple, the problems inherent in determining value for railroad use are staggering. Even if we should take the easiest assumption—one which the transferors may not adopt and which the Government parties will doubt-

less contest—namely, that the transferors would have acted as a group and dealt with the western and southern railroads as a group, and then determined what lines would have been purchased, we would next have to determine what the buyers would have paid.[66] We can assume that the transferors would not have sold for less than scrap value and that the buyers would not have paid more than a capitalization of the losses they would have suffered from cessation of service by the sellers $\pm$ the income (or deficit) from the properties bought. But where would the bargain have been struck? As said in the opening brief of the New Haven Trustee (p. 67), "it is impossible to refine the model to such a degree that a price, or formula for such a price, can be determined precisely, or even to predict the particular bargaining strategy each would adopt"; the Trustee believes the price most likely to be reached would fall in the band between the arithmetic and geometric[67] means of the original offers (p. 72). However this may be as to the entire universe of sales, there is no assurance that it would be true in the particular instance before us; common experience tells us that a negotiator will often adhere rather closely to his starting position if he feels confident of his superior bargaining power. Further guessing would be needed as to how the price should be allocated. To take just one example of the difficulties, a transferor whose line was not included in the hypothetical purchase might claim some share on the basis that the disappearance of its line enhanced the desirability of those that were continued; indeed, the transferors would very likely insist on some provision to deal with this contingency before joining the selling group.[68]

---

**66.** The Government may also be expected to argue that even a consortium of buyers would not have had the resources needed to rehabilitate the purchased properties. '

**67.** The geometric mean is the square root of the product of the two starting prices.

**68.** *See Cross, The Economics of Bargaining* 42–90 (1969), for a discussion of other factors that would affect the outcome of the bargaining process.

Economists, as a rule, are not so sanguine as the New Haven Trustee about their ability to determine where the bargain will be struck between the parties' bargaining limits. *See, e. g., Ferguson, Microeconomic Theory* 281–82 (rev. ed. 1969); *Henderson & Quandt, Microeconomic Theory* 247 (2d ed. 1971); *Shows & Burton, Microeconomics* 475 (1972); *Cohen & Cyert, Theory of the Firm: Resource Allocation in a Market Economy* 278–81 (2d ed. 1975).

We do not believe that Congress expected that this court would have to engage in such a prodigious and time-consuming effort in conjecture. As indicated earlier in this opinion, we fear that when Congress adopted the Rail Act it had a false security with respect to the relative ease of our determining the values here at issue, supposing that this would follow the model used in the New Haven inclusion in Penn Central. Indeed the FSP so declares. Vol. I, at 124.[69] Even that valuation had taken three and a half years for a much smaller property, but it was doubtless thought that more manpower could be deployed and that there would not be the same shuttling between the Interstate Commerce Commission and the courts. Little or no consideration seems to have been given by Congress to the complications arising from the fact that, whereas the hypothetical NH liquidation involved a single seller, the one here at issue would involve many. It is even clearer that Congress acted upon this expectation of a relatively speedy solution when it adopted the amended Act in 1976, with the FSP and its description of the MLP before it, see Vol. I, at 124–28, and with the need for taking account of possible sales for railroad use dismissed on the easy basis that "the prices for such sales would be regulated and fixed at the pricing levels which would obtain if all rail operations over the lines of the bankrupts actually ceased and as if the assets of the railroads in reorganization actually were dismantled and disposed of for other uses," Vol. I, p. 125, an assumption which was unexplained and in our view, unsound, see pp. 1010–1011, supra.

Our discussion in Part IV should have made two things very clear. One is that we will not value these properties on the basis of or even "consider" such fantasies of "experts" as RCNLD, trended OCLD, social value, etc., that would provide a bonanza to investors beyond anything of which they could have justly dreamed in the dark days of 1973. The nation's need for rail service affords no basis for the award as just compensation of "values" which these properties have not possessed for years and which their owners could never have realized except through condemnation by the Federal Government. The other is that we will not limit just compensation to provable market values if the transferors, through no fault of their own, cannot prove market value with sufficient nicety. We again remind the parties of the wisdom of Mr. Justice Black that "when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards," *United States v. Commodities Trading Corp., supra,* 339 U.S. at 123, 70 S.Ct. at 549. We have mentioned as one other standard that may be found worthy of consideration original cost subject to appropriate deductions—a figure which can be ascertained, with relative ease and without much guesswork, from records whose maintenance has long been required by law. We invite the parties to consider whether their interests might not be better served by endeavoring to reach agreement on a figure that can be so derived rather than by asking this court and ultimately the Supreme Court to seek a resolution, necessarily unsatisfactory to some and perhaps to all among the conflicting opinions of experts as to what could have been obtained by way of sales, with the attendant lapse of years and the incurring of enormous expense. We do not mean to limit such consideration by the parties to original cost with appropriate deductions—perhaps there is some better way. But we would be remiss if we did not advise the parties and also the lawmakers of our fears as to the length and cost of these proceedings if they are carried to a conclusion under the charter that has been given us, even with the simplifying limitations we have here imposed. Nearly four years have elapsed since the Rail Act was adopted and a year and a half have gone by since the conveyances. Yet despite earnest and sincere efforts by all concerned, we are only at the start of the valuation problem.

---

**69.** These statements are not contrary to our ruling that the Rail Act cannot properly be read as *prescribing* that method of valuation. We are here stating only what we think Congress expected, not what it prescribed or what the Fifth Amendment demands.

The parties are directed to proceed in the manner directed in this opinion. If the Acting Liaison Committee believes a conference between it and the Court would be desirable, we shall be glad to meet with them.

### On Motions for Reconsideration

The Trustees of the Property of Penn Central Transportation Company and certain affiliated transferors (hereinafter the movants) having moved for reconsideration of this court's decision of October 12, 1977 (the decision), which motion has been joined by the Intervening Penn Central Lienholders; the Trustees of Erie-Lackawanna Railway Company and certain affiliated non-bankrupts; the Trustee of the Lehigh Valley Railroad Company; North Pennsylvania Railroad Company, Delaware and Bound Brook Railroad Company, Philadelphia, Germantown and Norristown Railroad Company, Plymouth Railroad Company (the NBIO's); the Peoria and Eastern Railway (P&E); and others, it is ordered as follows:

1. The movants' first ground for reconsideration is that this court should make clear that the holding on pp. 1003–1004 of the decision that the method prescribed in § 306(c)(5) for determining the value of ConRail securities would pass constitutional muster in the sense that such securities might be used as part of the payment for the transferred properties, was not intended to preclude the transferors from contending that the particular method of valuing the ConRail securities was so unfair as to be unconstitutional. We agree; we will arrange for this to be taken up at a more appropriate time.

2. The movants' second ground is that this court "should make clear that no ruling has been made concerning the types of evidence relevant to show what buyers other than the Federal Government would have paid for the transferors' properties absent the Rail Act." (Motion p. 9) More specifically the movants ask us to say that our rejection of the reproduction cost and other types of evidence discussed at pp. 1031–1037 was confined to a hypothethical sale to the federal government, to which the reified property concept urged by some transferors should clearly be added, and would not preclude the offer of such evidence, notably real estate assemblage costs, if relevant to show "that, absent the Rail Act a particular corridor would have been sold to a private buyer who needed to acquire such a right-of-way and would otherwise have to assemble real estate parcels into a continuous corridor." (Motion, p. 8).

Our discussion was not intended to be as limited as the movants suggest. We had already rejected inclusion of the United States in the market (pp. 1015–1016) and the reified property concept (pp. 1012–1013) on other grounds. The principal purpose of our discussion on pp. 1031–1037 was to relieve the transferors of the expense of preparing and this court of the burden of hearing and passing upon studies of reproduction cost, etc., tendered on the basis that we might turn to such methods of valuation if efforts to establish market value proved unsuccessful. Although our discussion did not focus specifically on the possible relevance of such evidence to the price that would have been paid by profitable railroads or by public bodies other than the Federal Government, we think the instances where such evidence would have even minimal relevance, if existing at all, would be exceedingly rare. It is hard for us to understand why profitable railroads would have paid more than "a capitalization of the losses they would have suffered from cessation of service by the sellers ± the income (or deficit) from the properties bought," which we considered to be the upper limit of the bargaining range (p. 1044), simply because it would cost more to reproduce the property. It is equally hard for us to visualize public bodies taking into account such values as "assemblage costs," and the inclusion of any such items would acutely raise the question discussed on p. 1040–1041 of the decision. Hence, while the movants may be literally correct in saying (Motion, p. 8) that we did not mean "to exclude all such forms of evidence in all circumstances" (save for the principle of *Foley Square*), our instructions to the masters, while taking account

of the considerations now urged, will permit receipt of evidence on valuation theories generally rejected in pp. 1031–1037 of the decision only on a preliminary showing that particular prospective buyers would in fact have given weight to them—and perhaps only after submission of the question to the court. In sum, by agreeing with the movants to the exceedingly limited extent here indicated, we do not mean to allow quantities of evidence of reproduction cost, etc., to enter by the back door.

3. The movants ask us to reconsider our discussion (pp. 1022–1025) of decisions of the Court of Claims relating to the Government's use of patents. We find no reason to do so.

The additional point raised by the NBIO's does not persuade us to modify our holding on pp. 1001–1004 except as stated in item one above. We make the same ruling with respect to the P&E. If, as alleged in its statement of additional grounds for reconsideration, a 1972 study showed that major portions of its lines "could feasibly be sold or leased to other profitable rail lines", P&E should be able to establish a market value that will reflect this. We still hold that CV's and ConRail securities, properly valued, may be used to pay part or all of this.

We have already taken action, in accordance with movants' request, to postpone the effectiveness of our CUE decision until the entry of this order.

Except as heretofore stated, the motions for reconsideration are denied.